**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **V.** | § | **CRIMINAL ACTION NO.** |
| | § | **4:25-CR-00415** |
| **RAMON ALEXANDRO ROVIROSA** | § | |
| **MARTINEZ,** | § | |
| **MARIO ALBERTO AVILA** | § | |
| **LIZARRAGA** | § | |

## DEFENDANT'S MOTION TO DISMISS

Defendant Ramon Alexandro Rovirosa Martinez ("the defendant" or "Mr. Rovirosa"), by and through undersigned counsel, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A), respectfully requests that the Court dismiss the Indictment based on shocking and egregious misconduct of prosecutors in this case violating the Fifth and Sixth Amendment of the U.S. Constitution, for the reasons set forth below.

TABLE OF CONTENTS

SUMMARY OF ARGUMENT .................................................................................................... 4

BACKGROUND ON PROSECUTOR MISCONDUCT .......................................................... 4

A. *Political Directives to Address Immigration and Cartels, Including FCPA "Pause"* ...... 4

   1. Executive Order Making Cartels Terrorists ........................................................................ 5

   2. "America First" Agenda Reorients DOJ Attorneys to Violent Crime ............................... 6

   3. FCPA Enforcement Paused to Pivot to Cartels .................................................................. 7

   4. New Attorney General Tells Prosecutors to Focus on Cartels ........................................... 8

   5. Illegal Immigration Becomes Focus of 24-Hour News Cycle .......................................... 10

B. *Non-Cartel, Text Message FCPA Indictment* .......................................................................... 10

   1. Prosecutors Needed Cartel Narrative to Shore Up Thin Case ........................................... 11

   2. Cartel Story Fixed Both Weak Case and Political Problem ............................................... 13

C. *Sunday Arrest of Mr. (and Mrs.) Rovirosa* ............................................................................ 14

   1. Mr. Rovirosa Becomes DOJ Cartel Supervillain .............................................................. 14

   2. Impact to Mr. Rovirosa of Violent Cartel Associate Label .............................................. 15

D. *FCPA Cartel Media Blitz* ...................................................................................................... 16

E. *Government Misconduct to Tell Cartel Story* ........................................................................ 17

F. *False and Misleading Contents of the "Court Documents"* ................................................. 21

G. *DOJ Press Release* ................................................................................................................ 23

H. *Violations of DOJ Policy* ...................................................................................................... 25

I. *Violations of State Bar and SDTX Disciplinary Rules* ......................................................... 26

J. *Constitutional Impact on Mr. Rovirosa* ................................................................................ 28

K. *Remedy* .................................................................................................................................. 30

LEGAL AUTHORITIES REQUIRING INDICTMENT DISMISSAL ............................... 31

A. *Misconduct and Due Process Violations Require Dismissal* ................................................ 31

   1. Deprivation of Due Process by Malicious Document Filing and PR Efforts ................... 31

   2. Uncurable Prejudice to Mr. Rovirosa ............................................................................... 32

   3. Lying and Cartel Tactics Plus Modern Media Supercharge Harm to Defendant ............. 34

B. *Misconduct Deprived Defendant of Sixth Amendment Rights* ............................................. 37

   1. Sixth Amendment Framework ........................................................................................... 37

   2. Poisoning Nation Against Mr. Rovirosa with Violent Cartel Supervillain Branding ....... 37

C. *Prosecution of Mr. Rovirosa Based on Race for Political Reasons* ..................................... 39

   1. Purpose of Prosecution Tied to Race, Immigration, and Cartel Political Story .............. 40

   2. Effect of Prosecution Unlawfully Stripped Defendant of Due Process .......................... 42

**CONCLUSION** ..................................................................................................................... **44**

**CERTIFICATE OF SERVICE** ............................................................................................ **46**

<u>**SUMMARY OF ARGUMENT**</u>

This motion focuses on the tipping point where a criminal case must be dismissed based on the government's outrageous, intentional, and unconstitutional actions in violation of the Fifth and Sixth Amendment. The government turned their weak oil and gas Foreign Corrupt Practices Act ("FCPA") case into a violent Mexican drug cartel case with a false narrative to make politicians happy and gain an unfair advantage. Prosecutors created this story by filing a false document in the Court's record and then using that document to label Mr. Rovirosa a violent Mexican drug cartel associate across global news organizations, in violation of his constitutional rights. Mr. Rovirosa cooperated during the government's investigation. He is an innocent man. The government's novel effort to weaponize political messaging and fear against a defendant to tip the scales in their favor at trial is without modern precedent. This motion tells that story and explains why the prosecutors' conduct must result in dismissal of their Indictment. This case pits politics, racism, and unethical prosecutors against the Constitution.

<u>**BACKGROUND ON PROSECUTOR MISCONDUCT**</u>

A. *Political Directives to Address Immigration and Cartels, Including FCPA "Pause"*

Immigration was one of President Trump's key platforms during his 2024 election campaign.[1] And Mexicans and Mexico, were (and are) a prime target of this rhetoric. It seemed like not a day went by without Americans being bombarded with a widespread

---

[1] THE WHITE HOUSE, *Protecting the American People Against Invasion* (Jan. 20. 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/. *See* Exhibit 1.

campaign to highlight unlawful immigration in the United States. Immigrants, long associated in this country as Ellis Island, diversity, and economic strength, were identified as a problem confronting Americans.[2] And one root cause of unlawful immigration is Mexican drug cartels.

### 1. Executive Order Making Cartels Terrorists

On his first day in office, on January 20, 2025, Trump labeled cartels as terrorist organizations. This made sense to the President given the prominence of Mexican drug cartels in America's political dialogue. The Executive Order warned Americans that "[t]he Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs."[3] The Order continued,

> [t]he Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States.  In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society.  The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere.  Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

---

[2] In her September 8, 2025 dissent, Justice Sotomayor (joined by Justices Kagan and Jackson), outlined the impact of these policies in a Fourth Amendment case pending before the Court, noting a Los Angeles federal court's findings that government immigration enforcement efforts involving nearly 3,000 arrests and detentions in that city focused on race, ethnicity, language, locations in which Hispanic individuals were typically found, and job type. *See Noem v. Perdomo*, 2025 U.S. LEXIS 2779, *12-*15 (2025) (Sotomayor, J., dissenting). Justice Sotomayor noted that "[c]ountless people in the Los Angeles area have been grabbed, thrown to the ground, and handcuffed simply because of their looks, their accents, and the fact that they make a living doing manual labor." It is a gross understatement to say this is one of the most significant issues confronting our country, and "cartels" are tied by politicians to illegal immigration as part and parcel of the same issue.

[3] THE WHITE HOUSE, *Designating Cartels And Other Organizations As Foreign Terrorist Organizations And Specially Designated Global Terrorists* (Jan. 20. 2025), https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/. *See* Exhibit 2.

The Executive Order was unequivocal in setting forth a "policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States." This Order was not surprising and echoed President Trump's campaign promises. Following this Order, to be a Mexican cartel member, was to be a terrorist and enemy of the United States government—a death sentence. Today, we see fighter planes and military weapons deployed against cartels as our political leaders make continual calls for their destruction. *See* Exhibits 3, 5.

2. *"America First" Agenda Reorients DOJ Attorneys to Violent Crime*

At the Department of Justice ("DOJ"), prosecutors in the Fraud section in Washington, D.C. (the group of lawyers who prosecutes FCPA cases) had been conducting an investigation into bribery related to the Mexican oil company Pemex for the last several years. Their investigation had nothing to do with drug trafficking, cartels, or any of the issues that were important to the President (and presumably voters). *See* Exhibit 4. In addition to his cartel Executive Order, after the President took office, he undertook a number of substantive reforms at the DOJ to address what he perceived as systematic abuse by the government of prosecution powers, which, among other things, in his view had been used to target him and members of his constituency. *See* Exhibit 6. He also believed certain DOJ efforts were harmful to his "America First" agenda either because they were a waste of time/resources and not what voters cared about and/or they unfairly had an adverse impact on U.S. interests. The FCPA cases were one of the areas

that were the target of his ire. This was unsurprising because the President had long been dismissive of the FCPA as harmful to U.S. business interests. *See* Exhibit 7.

### 3. *FCPA Enforcement Paused to Pivot to Cartels*

On February 10, 2025, President Trump made his frustration with historical DOJ FCPA efforts clear. He ordered the DOJ, in a widely covered decision, to "pause" FCPA enforcement investigations and prosecutions for 180 days while the DOJ and his newly appointed Attorney General, Pam Bondi, reviewed priorities, with a focus on Mexican cartels and transnational criminal organizations ("TCOs").[4] Throughout his campaign, the President had focused on violent crime, drugs, immigration, and continually blamed cartels for a number of the problems facing the country. *See* Exhibit 9. When he was elected, he saw this as a mandate to address these issues and refocus the DOJ. He also perceived that a number of prosecutors in the DOJ worked secretly to undermine his agenda during his first term. When he took office, not only did he dismiss several cases that he viewed as political under the Biden administration, but he also fired the prosecutors involved in those cases—including the prosecutors involved in his own investigation and prosecution related to January 6. *See* Exhibit 6. An unparalleled effort by the President and new DOJ leadership to refocus the DOJ resulted in countless terminations of DOJ prosecutors, dismissal of cases, and resignations of DOJ lawyers. *See* Exhibits 10, 11, 12.

---

[4] THE WHITE HOUSE, *Pausing Foreign Corrupt Practices Act Enforcement to Further American Economic and National Security* (Feb. 10, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/pausing-foreign-corrupt-practices-act-enforcement-to-further-american-economic-and-national-security/. Exhibit 8.

4.  *New Attorney General Tells Prosecutors to Focus on Cartels*

When she joined the DOJ, in February 2025, Attorney General Bondi began moving resources away from corporate prosecutions towards violent crime and other national priorities.[5] She shifted resources to priorities such as immigration, ended groups focused on corporate prosecutions, and otherwise undertook efforts to focus on what the President believed were the most urgent issues that the DOJ should prioritize. One group impacted, of course, was the Fraud Section's FCPA group of prosecutors. Bondi's memo told them, "[t]he Criminal Division's FCPA unit shall prioritize investigations related to foreign bribery that facilitates the criminal operations of Cartels and TCOs, and shift focus away from investigations and cases that do not involve such a connection. Examples of such cases include bribery of foreign officials to facilitate human smuggling and the trafficking of narcotics and firearms." *Id*. She suspended any prior guidance on FCPA enforcement and set forth a reporting framework for the U.S. Attorney's Office to notify people in Washington, D.C. of FCPA-related charges to make sure they involved cartels. *Id*. In June 2025, the DOJ following Attorney General Bondi's directives published new "Guidelines for Investigations and Enforcement of the [FCPA]" prioritizing FCPA matters tied to cartels and TCOs and cases implicating U.S. national security or economic interests.[6] In Bondi and the President's view, FCPA cases were not important to voters, not in the interests of the country, and should only be pursued if they

---

[5] U.S. DOJ, *Total Elimination of Cartels and Transnational Criminal Organizations (TCOs)* (February 5, 2025), Exhibit 13.

[6] U.S. DOJ, *Guidelines for Investigations and Enforcement of the Foreign Corrupt Practices Act (FCPA)* (June 9, 2025), https://www.justice.gov/dag/media/1403031/dl. Exhibit 14.

involved the DOJ's focus on violent crime, as set forth in her *Total Elimination of Cartels* memo. *See* Exhibit 13.

Bondi's FCPA guidance made clear to prosecutors that they had to show cases were: (1) associated with the criminal operations of a cartel or TCO; (2) utilizing money launderers or shell companies that engage in money laundering for cartels or TCOs; or (3) linked to employees of state-owned entities or other foreign officials who have received bribes from cartels or TCOs. Exhibit 14. This meant that with no "cartel" nexus, an oil and gas-related FCPA case with thin evidence (like this one) was prohibited by the Attorney General and presumably get identified and quashed as part of the new reporting framework set forth in Exhibit 14, which ensured the DOJ focus on cartels and TCOs. In response, following the directions of the President and Attorney General, the DOJ dismissed a number of cases involving non-cartel and TCO activity.[7] On information and belief, the individual case dismissed by the DOJ in 2025 post-Bondi memo involved non-Mexican, non-Hispanic individuals.

---

[7] *See, e.g.*, U.S. DEP'T OF JUST., *Liberty Mutual Insurance Company* (Aug. 7, 2025), https://www.justice.gov/criminal/media/1410761/dl?inline (DOJ issued a declination letter stating its decision not to prosecute); PETRONOR E&P, *PetroNor E&P ASA: The U.S. Department of Justice Closes its Investigation* (Apr. 2, 2025), https://petronorep.com/media/jcwltjui/20250402-pnor-investigation-update.pdf (company informed DOJ closed its investigation); WILLKIE COMPLIANCE, Stryker Discloses that DOJ Closed its FCPA Inquiry (May 6, 2025), https://complianceconcourse.willkie.com/articles/stryker-discloses-that-doj-closed-its-fcpa-inquiry/ (DOJ closed inquiry into possible FCPA violations). In 2025, the DOJ has dismissed one individual FPA action, the defendants are former Cognizant executives, Gordon Coburn and Steven Schwartz are both white. On information and belief, there are four individual FCPA enforcement actions in trial/proceeding to trial in 2025/2026, in addition to this one, *U.S. v. Carl Zaglin* (SDFL – in trial); *U.S. v. Charles* Hobson (WD Penn – Feb. 2026 trial); *U.S. v. Amadou Kane Diallo* (CD Cal – Oct 2025 trail); and *U.S. v. Roger Alejandro Pinate Martinez, Jorge Miguel Vasquez, et* al (SD FL – Apr. 2026 trial date). This case is the only new charged FCPA case in 2025 post-Bondi memo.

### 5. *Illegal Immigration Becomes Focus of 24-Hour News Cycle*

After the election, in addition to the DOJ efforts to re-orient towards eradicating violent crime, the President and the government began a large-scale effort to combat illegal immigration. The recent "Big Beautiful Bill" allocated over $170 billion toward this effort, with Mexico, Venezuela, and other countries with brown skinned residents as a key focus. *See* Exhibit 15. Every day, the public blitzed with media about the horrors committed by undocumented migrants who the government arrested from the violent such as to raping and pillaging to the more mundane such as taking government resources away from citizens. Undocumented immigrants were public enemy number 1. And the worst of the worst, was the Mexican drug cartels and transnational gangs. The same organizations that FCPA prosecutors were supposed to focus on. Racially, they basically all looked the same—brown skinned, Hispanic people (like the average Houstonian). Lawsuits followed a number of these enforcement efforts targeting racial profiling, unlawful efforts to deport people without due process, and other alleged unconstitutional behavior.

### B. *Non-Cartel, Text Message FCPA Indictment*

Meanwhile, back in the DOJ Fraud section in Washington, D.C., the prosecutors on this case had a problem. The President and Attorney General now flatly prohibited their weak FCPA case based largely on text messages, making it look worse than ever. *See* Exhibits 13, 14. Moreover, the DOJ terminated numerous lawyers for violating the directions of the Attorney General and/or having been involved in politically motivated prosecutions. Many others had simply resigned. There was only one way to sneak this

case they had spent years investigating by politically appointed DOJ higherups—to invent a cartel nexus involving a wealthy Mexican. But without any admissible or substantiated evidence, they would not put such a connection in the Indictment, so they didn't.

### 1. *Prosecutors Needed Cartel Narrative to Shore Up Thin Case*

The Indictment charged Mr. Rovirosa and defendant, Mario Avila, only with conspiring to violate the FCPA and substantive FCPA counts. [ECF 1]. The Indictment, according to prosecutors' "discovery" letter, confirmed this case was an oil and gas-related case based on some text messages sent in the Houston area.[8] *See* Exhibit 1. Nothing about cartels. Ridiculously, as outlined in Defendant's Motion for a Bill of Particulars [ECF 30], virtually all of the allegations and text messages in the Indictment related to conduct that occurred in 2019 and 2020, beyond the statute of limitations.

The Indictment barely mentions Mr. Rovirosa. It alleges that defendant Avila provided property and money to foreign officials (whom Mr. Rovirosa is not alleged to have known, met, or interacted with in any way), to receive favorable treatment as part of

---

[8] Undersigned counsel took over this case for defendant Rovirosa on August 25, 2025. [ECF 24]. Shortly thereafter, government attorneys began sending emails about continuances and court deadlines, even requesting the defense agree to allow the government to take depositions in Mexico. To date, defendant has not received a non-encrypted discovery drive with the discovery that counsel for the defense is able to fully access, notwithstanding requesting the government provide a new discovery drive without multiple level of encryption. Prior counsel for the defendant had not received an unencrypted drive either. The government indicted this case on August 6. The defendant filed a motion to compel to address this issue and will file a motion to dismiss on the statute of limitations, at a minimum, this week. And defendants believe the Court will dismiss this case. The defendant will not agree, however, to postpone this case so the government can build a better case or prejudice the defendant's rights under the Speedy Trial Act with inaccessible discovery production. The sooner Mr. Rovirosa can clear his name, the better. If the Court calls the case ready for trial on October 6, the defense will be ready, notwithstanding government efforts to the contrary. The defense will not agree to a continuance under any circumstances; the government brought this case, and they need to prove it. And if they don't provide required discovery, the court should exclude that evidence at trial.

a Pemex audit and obtain two contracts involving "Mexico Energy Companies." The Indictment offers no clue how Mr. Rovirosa (nor Mr. Avila) are tied to these companies. It pleads no transactions involving supposed payments. Literally, it is just text messages, virtually all beyond the statute of limitations, and only a handful alleged to have been sent from the United States.

The schemes are bizarre as well. The audit in the Indictment supposedly would resolve amounts that would be deducted from amounts owed to the "Mexico Energy Companies" by Pemex as the unlawful benefit. The Indictment says that gifts and/or cash were provided foreign officials to help these "Mexico Energy Companies," without any tabulation of how prosecutors arrived at a $150,000 valuation. The rest of the Indictment talks about a scheme involving the same "Mexico Energy Companies" to win two contracts (neither of which was ever performed). The Indictment provides no clue how Mr. Rovirosa or Mr. Avila are tied to these companies. All of this occurred, the government says, in Mexico, except for a series of text messages sent by Mr. Avila. And it all occurred beyond the statute of limitations. The Indictment is highly (and improperly) editorialized with the government's interpretation of pronouns referenced in the messages to suggest Mr. Rovirosa's involvement. The reader would have no clue how Mr. Rovirosa was involved in any way, except for that the government says so.

The Indictment concludes by mentioning, as an afterthought, some text messages sent in 2021. The text messages involve a different company, are unrelated to anything else in the Indictment, and contain zero evidence of any hint of unlawful activity, but they do miraculously extend the purported schemes into 2021 (within the statute of

limitations). The government says these 2021 text messages are part of the contract and audit conspiracy because the government says so. In a feat of creative writing, the indictment, as noted in the Defendant's Motion for a Bill of Particulars [ECF 30], just drops Mr. Rovirosa's name throughout the document to create a conspiracy. As much as the government needs the 2021 text messages to relate to the 2019 and 2021 acts, it does not properly allege anything of the sort.

### 2. Cartel Story Fixed Both Weak Case and Political Problem

Even with text messages in Spanish, conduct taking place wholly in Mexico, and mentioning Mexican nationals in the Indictment, the Indictment still looked, well, like a weak and unprovable FCPA case that would likely make any politically appointed DOJ lawyer following the President's directives fume. Nothing related to cartels. Not only does it seem unprovable and beyond the statute of limitations, but the Indictment alleges a mere $150,000 in bribes based on purses, a treadmill, a watch, and some cash (with no indication as to how that was calculated or whether the government has any of those items—it reads more like wild guesses based on text messages). This hardly seems like one of the cartel cases that Attorney General Bondi had demanded.

To a lay person, it would seem like prosecutors were dead in the water. But these prosecutors got creative. To show some return on investment for years' worth of effort, prosecutors had a plan to tie the nonsense in the Indictment to something the President and political leaders care about—violent Mexican drug cartels and Mexicans immigrants, creating an unfair and unconstitutional advantage in their case. And, they could do it in a way that made a big splash, without ever having to prove anything, by filing improper,

misleading, and false information into the Court record to use as the foundation for a press release announcing an FCPA cartel case, laying a trap for the defense and shoring up their unprovable case with a "supervillain" narrative.

Once Mr. Rovirosa was arrested, this plan would go into action.

C.  *Sunday Arrest of Mr. (and Mrs.) Rovirosa*

After a longstanding effort to cooperate with the government's investigation, including meeting with prosecutors and voluntarily permitting the search of his office, Mr. Rovirosa was arrested on a Sunday morning, August 10, 2025, in The Woodlands, while taking his kids to a football event. Authorities initially detained his son, then arrested both Mr. Rovirosa and his wife.

1.  *Mr. Rovirosa Becomes DOJ Cartel Supervillain*

Authorities arrested Mr. Rovirosa and his wife on their street, in plain view of their surprised and fearful neighbors. Mrs. Rovirosa was handcuffed and then released. This was not nearly the worst of it. When he appeared in Court the next day, after sitting in general population overnight at the federal detention center in Houston, Mr. Rovirosa learned that the government had publicly labeled him a violent drug cartel member and told the world he has no ties to the city where he has lived the last 16 years, trying to link him to both the cartel and immigration narratives. He was shocked. He had never heard this before in his life, not in any meetings and interactions with the government, not once. No one had.

The Rovirosa family lived the American dream, coming to the United States legally, working in the oil and gas community, building a business with hundreds of

employees in Mexico, accumulating wealth, and becoming a pillar of The Woodlands community. Mr. Rovirosa fled Mexico in 2009 after a violent kidnapping and traveled to Mexico over the next 16 years on discreet trips to visit his businesses. Home for the Rovirosa family is The Woodlands, where they have built a life with their children, are heavily involved in football (the American kind), and become adored members of the Mexican American community. With three U.S. citizen children, a citizen wife, and Mr. Rovirosa on the cusp of citizenship, they are more than the model American family. They are a model Houston family, where diversity and culture differences are celebrated.

   2.   *Impact to Mr. Rovirosa of Violent Cartel Associate Label*

   The government took that away in an instant. Not with their Indictment (which has its own fatal legal deficiencies), but with deliberate and unethical misconduct necessary to bring their indictment. A community that Mr. Rovirosa helped build over the last 16 years now wants nothing to do with him as a cartel associate. Everywhere he goes, people question his relationship with cartels and terrorists. Not only did the government make Mr. Rovirosa a social pariah and destroy his business but based on their own narrative about the violent nature of drug cartels, the government has also placed Mr. Rovirosa's life in danger. Mr. Rovirosa will now face danger the rest of his life traveling to and from Mexico from rival drug factions, who may view him as a threat.

   The U.S. government has effectively given a man the Constitution presumes innocent, and with the weakest of FCPA cases, a potential violent death sentence. Mr. Rovirosa, who was on the verge of citizenship until the government interceded and blocked his efforts, is now an international pariah, designated a member of a terrorist

organization. All done without a trial, without an indictment, and only using an unlawful court document that the prosecutors needed to file to ensure their bosses at the DOJ falsely believed they were following what the President and Attorney General wanted.

D. *FCPA Cartel Media Blitz*

The Indictment does not mention Mexican drug cartels or any of the above information, because the government prosecutors know this is weaker than even the threaded together WhatsApp messages (complete with prosecutor commentary) in the Indictment. An improper court filing (discussed below) and dissemination of this information to the media, however, would create a citable, legitimate looking "court document," so that the government could use details involving drug cartels and violence in their press release. Voila, problem solved, and the government had its first "cartel" FCPA case, with a violent, drug trafficking Mr. Rovirosa. Pure fiction.

It was big news. According to the media, this case "mark[ed] the first charges under the [FCPA] filed by the Justice Department since President Trump paused foreign bribery enforcement and Attorney General Pamela Bondi ordered prosecutors to pursue cases against individuals with ties to cartels and other criminal organizations."[9] And it was a big deal for the prosecutors in the case, whose prospects of bringing an FCPA case after February 2025 looked grim (much less one in Spanish with virtually all of the conduct in Mexico). The DOJ's press release in this case initially claimed that "according

---

[9] DOW JONES, *U.S. Files Bribery Charges Against Mexican National with Alleged Cartel Ties* (Aug. 14, 2025), https://www.dowjones.com/business-intelligence/blog/us-files-bribery-charges-against-mexican-national-with-alleged-cartel-ties/. Exhibit 16.

to court documents, Rovirosa is alleged to have ties to Mexican cartel members." *See* Exhibit 17.

Of course, there was no mention of cartel links in the Indictment (because there is not any admissible evidence of anything of the sort). But the "court document" referenced in the press release created a basis to tell a "cartel" story. Prosecutors got to bring their FCPA case, slide into the cartel carveout to the FCPA pause, and spread the false news story that they had captured a violent Mexican drug cartel operative.

E. *Government Misconduct to Tell Cartel Story*

The "court documents" referenced in the press release amount to a single motion, "Motion to Impose Certain Conditions of Release" citing 18 U.S.C. §3142(c) and (g), [ECF 11]. This statute and these subsections provide for no such motion. In fact, there is no such motion—the government invented it for the purpose of inserting the cartel narrative into this case.

The Bail Reform Act ("BRA") only has two permitted motions relevant here set forth in 18 U.S.C. §3142(f)—a motion for detention and a motion for a continuance of a detention hearing.[10] The document filed by the government concedes it is not seeking detention, the only basis to file a motion under §3142. Section 3142(c), cited by the government, provides for release conditions (unrelated to detention). Section 3142(g)

---

[10] Subsection (g) also provides for a motion, not relevant here nor referenced in the government's document, to determine the source of forfeited property or as collateral, and provides, "In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."

provides detention factors, which the government was not seeking. It provides, "[t]he judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning . . . (1) the nature and circumstances of offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community." These are detention considerations, and (g) is listed right behind (f), addressing detention hearings and motions for detention.

Subsection (h), providing contents of a release order, which Mr. Rovirosa received, references subsections (b) (release on personal appearance bond) and (c) (release on conditions). Subsection (i), which addresses the contents of a detention order, provides that the magistrate judge shall make written findings and reasons for the detention, among other things. These findings would be based on a consideration of the factors in (g), which in themselves relate back to the same themes and language in (f), which provides two factors as considerations for detention—danger to the community and flight risk. *See* 18 U.S.C. §3142(f)(1) and (2). It also indicates when the government can move for detention: (f)(1)(A) crime of violence; (B) offense where maximum sentence is life or death; (C) a serious controlled substance act offense; (D) career criminals; and (E) crimes involving minor kids, firearms, or other devices, or failure to register as a sex offender; or (f)(1)(B) the person is a flight risk or risk of obstruction of justice. Subsection (g) is there to provide factors for the magistrate judge to consider in a

detention motion—this is why it talks about danger to the community ((A)-(E) and flight risk). It has nothing to do with non-detention motion conditions of release, which are in subsection (c), at the beginning of the BRA.

The government does not need a lesson in the BRA. It knows that its motion was not an actual motion and that the factors it listed in subsection (g) were only relevant if there were to be a detention hearing. The government knew the provisions it cited made clear this was not a lawful filing in a criminal case: (c) relates to release conditions and (g) relates to detention considerations. The motion specifically stated it was not seeking detention, so the information in (g) was unnecessary. The BRA is set up to only consider the information in (g) after an adversarial proceeding through a detention hearing, where it can be tested by the defense and a magistrate judge. By filing it into the record, the prosecution skipped this step of a "critical stage," and published its salacious version of Mr. Rovirosa in order to cite it in its press release.

Moreover, the local rules make clear this was not a motion as labeled by the government. Local Criminal Rule 12.2 requires pretrial motions to be in writing and state the basis for the motion and legal authority and be accompanied by a separate order for relief and by an averment that the movant has conferred with respondent. Local Rule 12.4 provides that "[a]ll motions must be served on all parties and contain a certificate of service." The government's "Motion to Impose Certain Conditions of Release" has none of these features because it was not a proper motion. The reason for this is clear: a motion connotes a request from the court to do something. When any such request is made, the court, under longstanding principles of jurisprudence, wants to hear from both sides

(absent extraordinary circumstances, not present here and typically categorized as an emergency motion for temporary relief until the other side may be heard). The motion here asked for no relief, nor did it have the other indicia of an actual motion. It was a naked effort by prosecutors to make this case something it's not and force Mr. Rovirosa to prove he is not a cartel member at trial.

The document filed by the government conceded that it was improper by asserting the government was not seeking detention, listing conditions of release (as contemplated by (c)). The prosecutors did not care; they needed this to be a "cartel" case. And there was no detention hearing in this case:

- On August 11, 2025, the government improperly filed a public "Motion to Impose Certain Conditions of Release" stating it was **NOT seeking to detain** Mr. Rovirosa [ECF 11] and at the same time unsealed the case to make it public. [ECF 10].

- The same morning, on August 11, 2025, at 10:00 AM, Mr. Rovirosa made his initial appearance before Magistrate Judge Bray on the morning docket, where he was informed of his rights and appeared with counsel, and he was **remanded to custody** with a detention hearing set for later that day at 2:00 PM, with Mr. Rovirosa in temporary custody with an Order of Detention Pending Hearing. [ECF 14].

- On August 12, 2025, the next day, a **sealed** pre-trial services report was entered [ECF 16], presumably with some of the information the government had already made public in its improper filing. The records are required to be filed under seal under 18 U.S.C. § 3153(c)(1)(mandating that pretrial services information be used "only for purpose of a bail determination and shall otherwise be confidential.").

- The same day, on August 12, 2025, the government filed its "Unopposed Motion for a Protective Order Regarding Discovery Materials," which sought to protect information the government had already made public in its improper motion releasing the false cartel narrative and painting Mr. Rovirosa as someone with no ties to the community.

The improper document used the same information the government's own motion sought to protect with a protective order and which the pre-trial services office had filed under seal.[11]

F. *False and Misleading Contents of the "Court Documents"*

The Motion to Set Conditions of Release was not only not permitted under §3142, but it was also patently false. [ECF 11]. It begins "in lieu of detention" and then lists what appears to be standard conditions for release. The motion goes on to improperly argue the detention factors in (g) to insert the cartel narrative into the record. This section starts with the misstatement that "Rovirosa lacked significant community or family ties to the Southern District of Texas." In the next sentence, the government mentions he has a $4.8 million house in The Woodlands (that the government had searched). His entire family lives in Houston—the government met his wife when they handcuffed her on their street. They met his kids when they stopped one of them on the way to an event while trying to find Mr. Rovirosa to arrest him on a Sunday.

The government then plants a landmine for the defense and drops a PR nuclear bomb, asserting, "there is evidence that Rovirosa has ties to Mexican cartel members and he was previously involved in violent conduct in Mexico. Multiple sources (set forth below) and media accounts (internet nonsense) have also alleged that another individual

---

[11] In the courtroom before a detention hearing, information may be provided by counsel to the pre-trial services officer, who makes a recommendation on conditions of release (typically, in Houston, parties are not allowed to leave the courtroom with pre-trial services officer reports and that information is treated as confidential as required by 18 U.S.C. §3153(c)(1)). Indeed, the local rules provide protections to information, such as what the government filed in the docket at the sentencing stage. *See* Local Rule 32.4 (providing sealing for confidential sentencing information). Pre-trial services filed their report under seal to protect the sensitive information the government disclosed pursuant to 3153(c)(1), but the government had already told the story it wanted by filing their improper document in public, violating the letter of their sought protective order before the Court could issue it. [ECF 17, 23].

with a close business relationship to Mr. Rovirosa is associated with "Mexican cartels." Totally unsubstantiated and prejudicial nonsense to support the prosecutors press release. The government also added in their motion, which was unnecessary to determine bond conditions, that they had an extremely strong case (they did not mention it was based on old text messages that Mr. Rovirosa didn't send) and that Mr. Rovirosa faced "lengthy" time in jail (a puzzling contention with $150,00 in alleged bribes and no real gain). They also put that he owned a private plane and multiple bank accounts to seal the rich Mexican cartel story. Prosecutors electronically signed and submitted this improper and false document to the Court, telling any reporter who looked that the United States government stood behind these lies.

The government's cartel allegation appears to be based on the gigabytes of discovery documents subject to the prosecution's protective order (which it violated), to amount to: (a) during interviews, they heard from a criminal and a disgruntled business person that Mr. Rovirosa was a rich Mexican who was kidnapped in Mexico in 2009 and at a party in The Woodlands had bragged about killing his kidnappers (a party attended by numerous others who would deny this occurred, including Mr. Rovirosa's wife),[12] (b) Mr. Rovirosa hangs out with other rich Mexicans and owns a Ferrari, so he must be a cartel associate; (c) bank Suspicious Activity Reports ("SARs") (generated by the DOJ's

---

[12] The statements made are outrageously false, and Mr. Rovirosa is evaluating potential legal remedies to remedy the harm. The criminal cooperator who made these statements made them entirely to deflect his own significant legal jeopardy and to manipulate the prosecutors for personal gain. Prosecutors needed a "cartel" nexus to their FCPA case, so they didn't bother to test any of the accusations and were more than happy to circulate them globally, creating the Rovirosa "supervillain" they publicly needed for their case, and irreparably tainting the case so that they waive around the "cartel" association in order to get a conviction. After the Court dismisses this action, prosecutors should refer this individual to investigators who pursue non-cartel FCPA cases and can investigate the cooperator for making false statements to investigators in violation of 18 U.S.C. §1001.

own subpoenas) said he was suspicious and that Mr. Rovirosa had purchased property, unbeknownst to him, from a man with a criminal record; (d) his ownership in a private plane suggests drug ties (prosecutors put that in their fake motion too); and (e) some internet rumors and innuendo. In fact, the government's entire case focusing on Mr. Rovirosa stemmed from this maliciously false information.

The reason prosecutors created this fake filing was to deliberately insert a "cartel" narrative into this case to camouflage the true nature of the case. More sinisterly, they did it to win their case by making it about violent Mexican drug cartels instead of weak text message evidence. Otherwise, there was no reason to file it (and it contained misstatements and improper information). It was not required, cited statutes and rules that did not permit it, and contained information that was protected and highly inflammatory. There was zero reason to include the "flight risk" and "danger to the community" factors, because those are only considerations for the magistrate judge if the government seeks detention. But prosecutors were hoping no one would take a second look at its fake motion or the Indictment. If a supervillain from the cartel was involved, who would look closely at what prosecutors actually charged as a bunch of text messages, beyond the statute of limitations and stating no crime?

G. *DOJ Press Release*

The DOJ's press release in this case initially claimed that "according to court documents, Rovirosa is alleged to have ties to Mexican cartel members." *See* Exhibit 17. Two days after the press release wrongly tied Mr. Rovirosa to drug cartels, when counsel for Mr. Rovirosa complained, the government corrected the error and revised the release

to remove the false cartel allegation. *See* Exhibit 18. The government, however, did not issue a retraction. Why would it? This was part of the plan all along. Tell a political story of an FCPA "cartel" case to fit within the political narrative and narrow DOJ FCPA policy and then use that narrative to shore up an unprovable FCPA case with a violent Mexican cartel boogie man as the defendant.



PEP. Those improper advantages helped companies associated with Rovirosa obtain contracts with PEMEX and PEP worth at least $2.5 million. In addition, according to court documents, Rovirosa is alleged to have ties to Mexican cartel members.

H. *Violations of DOJ Policy*

When prosecutors filed their Motion to Impose Conditions of Release, they violated DOJ policy prohibiting such actions. The press release only supercharged the prejudice resulting to Mr. Rovirosa from the filing. The Code of Federal Regulations, which documents DOJ policy prosecutors must follow, flatly prohibits the government's actions above. In 28 C.F.R. § 50.2, the DOJ is barred from releasing the type of information it included in its Motion to Impose Certain Conditions of Release [ECF 11].

Section 50.2(b) provides, "[a]t no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial." The CFR prohibits DOJ lawyers from making such statements (as well as from fabricating connections with summary and unsupported conclusions as was done here). This DOJ guidance practically concedes constitutional error, writing, "[t]he release of certain types of information generally tends to create dangers of prejudice without serving a significant law enforcement function, [including], (i) observations about a defendant's character." *Id*. at 50.2(b)(6). The only way to release such information under the guidelines is to "request the permission of the Attorney General or the Deputy Attorney General." *Id*. at 50.2(b)(9). *See* Exhibit 19.

It is hard to imagine a more prejudicial action than releasing a statement indicating that a defendant is a violent associate of a Mexican drug cartel, the worst kind of terrorist, to thousands of press contacts.

### I. *Violations of State Bar and SDTX Disciplinary Rules*

For obvious reasons, the model ethics rules for prosecutors follow the DOJ guidance set forth in the CFR and prohibit the filing and disclosure of the information released by the government. Model Rule 3.8, for instance, provides that prosecutors shall, "except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule." Exhibit 20. Model Rule 3.6 provides, "[a] lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." Exhibit 21.

State bars, to which the government lawyers in this case are subject to, have adopted some version of these rules. For instance, Texas Disciplinary Rule of Professional Conduct Rule 3.09 (which the courts in Houston adhere to) provides, "the

prosecutor in a criminal case shall . . . exercise reasonable care to prevent persons employed or controlled by the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.07." Exhibit 22. Not only does this prohibit prosecutors from making such false and salacious statements as they did here, but it also imposes a duty to prevent misstatements from persons employed or controlled by the prosecutor. *See id.* In other words, the prosecutors in this case had a duty under the Texas bar rules to prevent what happened to Mr. Rovirosa. That they actively created a fictitious filing to accomplish what they were supposed to prevent is unconscionable. Similarly, Texas Rule 3.07 provides, "[i]n the course of representing a client, a lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding. See id. A lawyer shall not counsel or assist another person to make such a statement." Prosecutors in this case not only abdicated these duties, but they also facilitated the distribution of the information in their unlawful court filing to news organizations across the globe. And their effort worked. *See* Exhibit 23.

In his dissent in the *United States v. Armstrong*, 517 U.S. 456, 470 (1996) (Stevens, J., dissenting), Justice Stevens notes, that "[t]he United States Attorney is a member and an officer of the bar of [the particular] District Court [where the case is pending] . . . and has a duty to the judges of that Court to maintain the standards of the profession in the performance of [his/her] official duties." The local rules for the

Southern District of Texas set forth those expectations in their Guidelines for Professional Conduct, providing that the minimum standards of practice in Houston federal court are set forth in the Texas Disciplinary Rules of Professional Conduct, and that "[v]iolation of the Texas Disciplinary Rules of Professional Conduct will be grounds for disciplinary action."[13] In their headstrong effort to insert the "cartel" narrative into this case, there is no question the lawyers involved not only violated internal DOJ guidance, but they also violated the ethics rules set forth for litigants in the Southern District of Texas.

## J.   *Constitutional Impact on Mr. Rovirosa*

Mexican drug cartels are blamed for virtually every problem impacting U.S. society. They caused the fentanyl crisis. They traffic humans, rape children. They murder and pillage. They have been branded terrorist organizations with threatened (and actual) military action. They are the reason for high tariffs with Mexico. Cartels are part of the reason for the immigration problems as they help migrants cross the border. Pick a problem with this country, and you can likely find some nexus to the violent Mexican cartels. For most Americans, the boogie man of the Mexican drug cartel is a faceless or masked person seen on social media or in the news with weapons, drugs, dead bodies, or engaged in some other illicit activity. Only high-level leaders are unmasked and treated as enemies of the state. When the government publicly identified Mr. Rovirosa as a

---

[13] Rules of Discipline, United States District Court of Texas, Rule 1 (Effective August 18, 2023). The undersigned counsel reads Rule 6, as a requirement that undersigned counsel bring this matter to the attention of the chief judge, Hon. Randy Crane, with a copy of this motion, with a copy to the Clerk of Court, following this filing.

violent associate of a Mexican drug cartel, it provided a new face for cartels with the public and potential jurors: Mr. Rovirosa.

Through their actions, prosecutors have made the cartel narrative unwinnable for the defendant. This case has fatal legal deficiencies, in addition to being unprovable; but even assuming a trial, Mr. Rovirosa will now have to address this issue with the jurors in *voir dire,* contend with it as part of the trial (explaining why the prosecutors would bring a "cartel" FCPA case to the *petit* panel) and challenge the "cartel" investigation when questioning witnesses (it is the reason prosecutors brought this case). He must prove the unprovable (a negative), that he is not a member of a cartel, because the government put it out there with their landmine filing and globally distributed false story. They have forced Mr. Rovirosa to put on a cartel case; shored up their weak FCPA text message case by painting Mr. Rovirosa as a supervillain and making him prove he is not. Moreover, the constitutional infirmity of prosecuting Mr. Rovirosa based on his skin color and nationality to inform a cartel narrative cannot stand. Successful selective prosecution claims are the exception, not the rule, but this case was also an exception to DOJ policy by invoking "cartels" using prosecutorial misconduct. *See United States v. Falk*, 479 F.2d 616, 623-24 (7th Cir. 1973) (noting "we wish to note our disapproval of the apparently frequent, and often too easy, practice of simply dismissing all allegations of illegal discrimination in the enforcement of criminal laws with a reference to *Oyler v. Boles* . . . statement that the conscious exercise of some selectivity in the enforcement of laws does not violate the Constitution.[,] . . . .[this] principle does not in many cases answer the question whether selective enforcement in a given case is invidious

discrimination which cannot be reconciled with the principles of equal protection."). The stain of the "cartel" brand will never totally wash away, either in the trial, or in the public, and the only appropriate remedy here is dismissal.

K. *Remedy*

Prosectors could not bring their shoddy oil-and-gas case to the DOJ press office—it did not fit within the guidance, and it was not provable. They had to create a new narrative. The needed a Mexican, brown-colored boogie man to prosecute, so they unethically and unlawfully created one, in violation of the Fifth and Sixth Amendment—applying the FCPA with "an evil eye and unequal hand." *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). The problem for the prosecution, as Dr. King wrote, "evil carries the seed of its own destruction."[14]

There are no cases directly on point with these facts, because there has never been a case where the government has ordered the prosecution of individuals that fit within a particular stereotype and race, against the background of massive government raids and arrests of undocumented immigrants, all focusing on one type of race and ethnicity. Prosecutors then filed a misleading and improper court document in order to issue a press release categorizing a bunch of text messages as a violent cartel case, poisoning jurors and creating an unfair trial advantage. This confluence of forces—daily media attention on cartels and bad faith government action to smear a defendant as a violent cartel supervillain—created uncurable due process and Sixth Amendment violations. This case

---

[14] Martin Luther King, *Strength to Love* (1963), 82.

may be unprecedented, but the remedy is not; egregious, outrageous, and bad faith government misconduct must be addressed by dismissal as set forth below.

**LEGAL AUTHORITIES REQUIRING INDICTMENT DISMISSAL**

There are three independent constitutional violations that doom this case. Two of the violations occurred post-charging, which includes the prosecutorial misconduct that: (1) deprived Mr. Rovirosa of his Fifth Amendment right to a fair trial with the injection of the cartel issue into the case; and (2) the impact on potential jurors of this story, against the backdrop of an unprecedented effort to portray cartels as an existential threat to our country, that deprived Mr. Rovirosa of his Sixth Amendment right to a jury untainted by the government's illegal PR campaign. Separately, (3) the government's illegal charging decision based on Mr. Rovirosa's race and nationality to meet political objectives constitutes selective prosecution in violation of his Fifth Amendment due process rights. The Constitution has one referee, this Court. When the government cheats to win, the remedy is clear. The case is dismissed.

A. *Misconduct and Due Process Violations Require Dismissal*

    *1. Deprivation of Due Process by Malicious Document Filing and PR Efforts*

There is no case that directly applies to this set of facts. The DOJ is under unprecedented pressure to pursue prosecution priorities set by the President, who has articulated these overarching priorities through different executive orders, which mostly focus, at the enforcement level, on violent crime, immigration, and drugs. The President believes these are the priorities of the American people who voted him in to office, so he

has directed the DOJ to focus on these priorities. Prosecutors who do not follow these directives find themselves without a job.

Not on anyone's list as a prosecution priority: the FCPA. The FCPA prosecution unit has filed one case since President Trump implemented a "pause" on FCPA prosecutions and Attorney General Bondi re-prioritized FCPA enforcement efforts on cartels and transnational criminal organizations (i.e., violent crime, which fits within the rest of the President's agenda). This one. And prosecutors have known for a long time that this case is weak. When they filed it, they filed an improper document to tell a story that fits a political agenda and poison the jury. They did so for two reasons, both unlawful. First, they wanted to disguise the true nature of this case to fool politicians and politically appointed DOJ lawyers. Second, even more outrageously, they did so to cheat and win—to shore up a ridiculously flimsy case by saying that their text message case fit into a larger effort to combat the root of all evil in the country. These dual purposes are patently unconstitutional and created a deck stacked against Mr. Rovirosa. They couldn't win on the facts, so they cheated to win; furthermore, the benefit of telling this story is it helped make DOJ and other political leaders happy.

### 2. Uncurable Prejudice to Mr. Rovirosa

The federal courts have inherent powers to address unethical and improper behavior of prosecutors. It is impossible for Mr. Rovirosa to put on a non-cartel case and prove his case. Mr. Rovirosa faces the untenable position of showing that this case is extremely weak, with evidence and witnesses in Mexico, records and communications in Spanish, no ties between Mr. Rovirosa and foreign officials, who have no idea who he is,

and to prove a negative. The government's evidence, their core case, by their own admission, is based on some text messages (not even sent by Mr. Rovirosa). When the Houston jury sees this, they'll wonder why in the world would prosecutors in the U.S. bring such a ridiculous case having to do with Mexico?

The answer that prosecutors injected into this narrative is that they brought it because they want you to think, wrongly, that Mr. Rovirosa is a member of a violent drug cartel. And they want the defense to offer this story to defend the case and show why prosecutors brought this case. The false document was a well-laid, unconstitutional land mind. Prosecutors knew they just had to plant it somehow and wait for the defense to step on it. There is nothing this Court can do to remove it, and prosecutors deliberately placed it in this case. Prosecutors were hoping that defense lawyers would bring this up at voir dire (which they now must do), and with the petite jury in opening statements. They must try to explain why the government brought this case targeting Mr. Rovirosa. They also must bring it up to address potential juror prejudice (as outlined below). Not to mention the government will likely call witnesses, including agents, who will likely say this. Voir dire, jury instructions, and warnings to prosecutors (who have shown a proclivity for scorched earth litigation tactics such as filing fake documents, arresting cooperating defendants on the weekend, and taking a narrow view of discovery obligations) will not protect Mr. Rovirosa's right to due process.

To defend his case, Mr. Rovirosa must interject the cartel narrative into his defense because that's why prosecutors brought the case, that's why they smeared him in a press release, and it is why prosecutors filed false and unreliable information into the

public record in violation of court and state bar rules. Once interjected, as prosecutors intended, how does Mr. Rovirosa prove he is not a cartel associate? By showing that the witnesses are lying. By excluding the bank SARs, ridiculous documents lacking appropriate foundation such as internet records (which is clearly inadmissible, under Federal Rules of Evidence). Prosecutors knew, once they put this in the case, that Mr. Rovirosa could never disprove it. They wanted this case to be about cartels to please politicians and political leadership at DOJ. All they had to do was plant an illegal document in the record, spread a false story in the press, and wait for Mr. Rovirosa to step on the land mine. Prosecutors deliberately created an issue, one that Mr. Rovirosa cannot disprove, which is not in their Indictment and flatly prohibited by court and state bar rules. They violated one DOJ policy to fit into another. This Court cannot allow prosecutors' text message FCPA indictment to survive this underhanded effort to steal Mr. Rovirosa's right to due process. *Falk*, 479 F.2d at 625 ("[t]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government." *citing Stamler v. Willis*, 415 F.2d 1365, 1369-1370 (7th Cir. 1969), *cert. denied*, *Ichord v. Stamler*, 399 U.S. 929, 90 S. Ct. 2231, 26 L. Ed. 2d 796 (1970)).

       3.  *Lying and Cartel Tactics Plus Modern Media Supercharge Harm to Defendant*

      This case has few modern parallels. Undersigned counsel could not locate another case where prosecutors took deliberate actions to inject a malicious and false narrative about a defendant into the court record, in violation of ethical and court rules, to tell a politically compelling story in a press release and fit within DOJ charging guidance (yet,

ignoring other applicable DOJ directives). And this was all done in an effort to create an advantage in litigation to shore up a legally deficient case. An effort to create a "cartel" case. Instead of trying the case they charged, DOJ lawyers get put on the case they wanted to charge, and to tell the story they needed to tell for political purposes, using a narrative the jurors would find compelling, the fight against vicious drug cartels. Jurors may forgive them for bringing a ridiculous and unprovable case if it's in the name of defending America. Calling this behavior an egregious and bad faith violation of Mr. Rovirosa's rights is a gross understatement.

This "cartel" narrative tells the worst possible story about a defendant, at a time when the country is divided on immigration issues, immigration and cartel narratives fill the news, and pointing to membership in a terrorist organization that has few modern parallels plays into stereotypes based on his skin color, nationality, and ethnicity. The prosecutors did this deliberately to bring the case, and to win over public opinion.

The U.S. government destroyed a man's life and upended the Constitution to tell a "cartel story." With a case that is based on text messages, with conduct proscribed by the applicable statute of limitations, in Spanish, in Mexico. DOJ directives did not stop these prosecutors. Nor did state bar rules. Nor did the Court's rules. The only thing that can right this injustice is dismissal. The Court has the inherent power to right this wrong and end the prosecution unlawfully seeded with a false cartel narrative.

This type of conduct must be strongly condemned by dismissing the Indictment. In *McNabb v. United States*, 318 U.S. 332, 340-41 (1943), the Supreme Court noted "[j]udicial supervision of the administration of criminal justice in the federal courts

implies the duty of establishing and maintaining civilized standards of procedure and evidence . . . [and] [s]uch standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as "due process of law" . . . ." This Court cannot let this egregious conduct stand. In *Elkins v. United States*, 364 U.S. 206, 223 (1960), an unlawful search case, the Supreme Court warned federal judges to avoid becoming "accomplices in the willful disobedience of a Constitution they are sworn to uphold."

The government attorneys acted flagrantly, willfully, and in bad faith to insert a cartel narrative both in this case and the public to win. Mr. Rovirosa must now address this "cartel" narrative at trial, which is highly prejudicial. Forcing a trial in this matter will give the government exactly what it set out to do—put a face on its "cartel" villain and tie it to the FCPA, a huge win for prosecutors and huge loss for the Constitution and the rights of defendants facing the unethical, win at all costs actions by the prosecution at their expense. This Court may exercise its supervisory power to dismiss this case, "to preserve judicial integrity by ensuring that a conviction rests of appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)).

The government's handiwork cannot be undone. The Court filings and the press release are records that are now part of the government's case. It is in the court records. It originated from government subpoenas (which created bank SARs) and unreliable government witness hearsay. It was an unseen, key part of the government's effort to

win. It is impossible to excise this cancer from the government's weak FCPA case. With a proclivity to ignore Court and ethics rules, these prosecutors will happily use this narrative to improperly upend the trial. They have done it once, ignoring ethical mandates and DOJ rules. Win at all costs is not the job of a federal prosecutor. Cheating to win cannot be tolerated. The Court is Mr. Rovirosa's only referee and protector of his constitutional rights.

B. *Misconduct Deprived Defendant of Sixth Amendment Rights*

### 1. *Sixth Amendment Framework*

In addition to forcing Mr. Rovirosa into a "cartel" trial in violation of his due process rights, the government has also deprived the defendant of his Sixth Amendment rights, which set forth the core framework to ensure defendants receive a fair trial. The Amendment reads:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

### 2. *Poisoning Nation Against Mr. Rovirosa with Violent Cartel Supervillain Branding*

With their unlawful filing, the government has created the cartel FCPA case it needed. With tremendous pressure to meet political objectives, the prosecutors ginned up a fake cartel case and a face for the Houston community to hate as a cartel associate: Mr. Rovirosa. Prosecutors deliberately created this story to cheat and to smear Mr. Rovirosa

to Houston jurors, in violation of state bar ethics rules. The Sixth Amendment shields Mr. Rovirosa from this unlawful effort.

This misconduct set the stage for unprecedented and shocking prejudice to Mr. Rovirosa. The prosecutors did not just leak some information about Mr. Rovirosa that tied him to the case in a public way, they called him a violent Mexican drug cartel associate. They did so with a global media campaign, in violation of DOJ and state bar rules. And they did it to win. It is impossible to get a fair jury trial in this case going forward. The government made Mr. Rovirosa the face of violent Mexican drug cartels. Everywhere online, Mr. Rovirosa is a violent Mexican cartel associate. The Mexican American community sees him as a cartel associate. It would be impossible to not address this issue in *voir dire* and explain that the government falsely asserted this, and then, to convince the jury, introduce evidence of the above series of events through government agents. The case would be a cartel case. An FCPA cartel case. Even though there is zero evidence of cartel activity, in order to explore this issue with the jury panel in *voir dire*, the defense would have to ask. That's what the government wants—they cheated to get this result. Even if the defense did not do this (risking an ineffective assistance of counsel claim), there is tremendous risk a government witness would again improperly insert this narrative. They did it once before, in violation of every rule lawyers who practice before this Court are subject to. And at trial Mr. Rovirosa now has to prove a negative to put on his defense. He must prove he is not a member of a cartel. He is stuck with proving uncharged cartel conduct in his weak FCPA case to the jury. Prosecutors needed this cheat to try to win because their indicted case is horribly

deficient. This outrageous injustice cannot stand. Dismissal of this Indictment is the only appropriate remedy.

C. *Prosecution of Mr. Rovirosa Based on Race for Political Reasons*

Even before the government unlawfully tarred Mr. Rovirosa as a violent Mexican drug cartel associate, the government's efforts highlight that the only reason he was prosecuted is because he is a wealthy Mexican.

To prevail in a selective prosecution case, the defendant must show discriminatory effect (similarly situated comparators of a different race/class not prosecuted) and discriminatory purpose. *See United States v. Armstrong*, 517 U.S. 456, 463-65 (1996). In his dissent in the *Armstrong* case, Justice Stevens noted that while federal prosecutors are ordinarily given the benefit of the doubt for selective prosecution claims as properly discharging their official duties, "the possibility that a political or racial animosity may infect a decision to institute criminal proceedings cannot be ignored." *Id.* At 470 (Stevens, J., dissenting). Here, the DOJ forfeited its presumption when it targeted Mr. Rovirosa because he is a wealthy Mexican and the prosecutors created an improper and misleading court document to tell its fake "cartel" story.

In 1981, Jack Bass wrote a book, *Unlikely Heroes*, about the Fifth Circuit Four — Hon. Elbert Tuttle, Hon. John Minor Wisdom, Hon. John R. Brown, and Hon. Richard Rives—that traced the efforts of the Fifth Circuit to implement *Brown vs. Board of Education* in the southern states. Those judges understood that what makes us American is our embrace of our differences, and judges are the last line of defense against unconstitutional actions. But politicians often focus on what makes us different.

The DOJ is not supposed to be a political organization. They are held to higher standards and are supposed to do what is right, not anything they can do to win, even if unlawful. They are supposed to operate within the bounds of the Constitution irrespective of a political agenda, such as ensuring that an FCPA involves Mexican terrorists or cartels to make political leadership happy. When it interjected "cartel" into the narrative through false and improper pleadings, the DOJ revealed an improper motive in prosecuting the case—it could not be about the FCPA (no one cares about the FCPA), it had to make the case about race and nationality. They needed a Mexican cartel scalp.

1.  *Purpose of Prosecution Tied to Race, Immigration, and Cartel Political Story*

It is not a stretch of the imagination that a wealthy Mexican national could fit within the false narrative of a drug cartel FCPA case. Popular media (and politicians) have long associated Mexican drug cartels, with, (obviously) Mexicans. When the public imagines cartel members, the people are brown (when their faces are not covered with frightening masks). When leaders are arrested, they are also Mexican. They look like Mr. Rovirosa (and, for that matter, well over half of Houston). In their case files, the DOJ had to find people that looked like Mr. Rovirosa to feed the cartel narrative and the media machine.

Less egregious cases than this are plentiful and show the unprecedented and bad faith nature of this effort. For instance, in *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998), two law enforcement officers had t-shirts made to taunt the defendant, saying "See ya, wouldn't want to be ya" on the front above his picture, with "going back to prison" below the photo, and on the back, a photo of the defendant's wife, a co-defendant, with

the words, "wait on me . . . I'm coming too." One of the officers sent a postcard while on vacation to the defendant after his arrest that pictured a black woman with bananas on her head [the defendant was black], taunting the defendant about going to prison. The defendant also cited local statistics about other prosecutions in Murfreesboro, Tennessee, noting that the small town police department had referred four black defendants for prosecution out of fourteen drug defendants over a five year period (two were white, two were Hispanic, two were Lebanese, and one was Israeli). The Sixth Circuit reversed the district court, finding this did not state a prima facie case of selective prosecution. Citing *Armstrong*, the Sixth Circuit noted, "to establish discriminatory intent in a case alleging selective prosecution based on race, a claimant must show that the prosecutorial policy was motivated by racial animus; to establish discriminatory effect, the claimant must demonstrate that similarly situated individuals of a different race were not similarly prosecuted." *Jones*, 159 F.3d at 975-76. The Court noted the defendant stated a prima facie case of discriminatory intent.

There is no question that Mr. Rovirosa was prosecuted not because the DOJ alleges that he did something wrong in 2019 and 2020, but because the DOJ needed a "cartel" nexus in order to cheat and tell their cartel story. Their FCPA policy said they needed a person with brown skin, a Mexican. Otherwise, why prosecute a case based solely on text messages, conduct that occurred in Mexico, when all of the conduct besides several messages is beyond the statute of limitations (and that conduct was not part of the

same "scheme," as will be addressed in a separate motion to dismiss)?[15] Why contrive a court document and file it in the record for purposes of a press release? Why put uncharged conduct in a press release (even if it was true) in violation of DOJ policies? Obviously, they did this to cheat and win their case, but they also did it because they needed a brown-skinned Mexican to make politicians happy.

*2. Effect of Prosecution Unlawfully Stripped Defendant of Due Process*

Likewise, Mr. Rovirosa can show discriminatory effect of this policy. The DOJ's policy says that the government must find a "cartel" nexus to bring FCPA cases. And this is the only individual FCPA case filed since the DOJ implemented its cartel directive. It is a 1:1.

The case law is clear that the DOJ cannot institute a prosecution against Mr. Rovirosa based on his ethnicity and because he fits their cartel narrative. In Mr. Rovirosa's case, it is clear that the *sine qua non* of Mr. Rovirosa's indictment is that it fit within the cartel narrative. Virtually every news article about the Southern District of Texas U.S. Attorney's Office brags about border-related prosecutions. Prosecutors brought this case and stripped Mr. Rovirosa of his constitutional rights for due process and a fair trial to fit into this broader narrative. This is an impermissible charging decision if there ever was one. Moreover, the presumption normally afforded prosecutors

---

[15] Defendant's motion to dismiss on statute of limitations will reveal a fatal flaw in the government's case. The government charged three schemes—two involving obtaining contracts and a third related to an audit (all unprovable from defendant's perspective). But the last act of these two schemes ended in April 2020. The Indictment in August 2025 was months after the statute of limitations had run. So, to try to fill this gap, prosecutors inserted several text messages (¶53-58) that not only have nothing to do with the three schemes (not involving same entities or conspiracy), but facially, they don't even suggest any illegal conduct. The prosecutors know their case was out of time, so, just like the cartel narrative, they invented conduct within the statute. Why? To selectively prosecute the cartel, boogie man—a brown Mexican national.

of good faith should not apply when they have willfully violated both court and internal DOJ rules to achieve a PR result to disguise the true nature of their case. Incontrovertible facts suggest that Mr. Rovirosa was prosecuted because he is a Mexican and that fit the government's cartel narrative.

In 2025, with the nationwide focus on deportations and immigration prosecutions, it is particularly difficult to be a Hispanic American, much less a lawful Mexican permanent resident trying to obtain citizenship. The Mexican drug cartels, now terrorist organizations, have remained public enemy number in the cross hair of government enforcement efforts. At a time in our country when the media continually reports arrests of individuals based on their skin color and apparent nationality, the prosecutors used this case to fit into a narrative they knew was wrong. They brought a weak bribery case against a Mexican American because he is Mexican and could be easily branded a "cartel" associate to shore up their case. By selectively prosecuting Mr. Rovirosa based on his race, the government contributed to perceptions and stereotypes which are the opposite of the DOJ's mission. And the opposite of what our community in Houston stands for.

Historically, courts (and the undersigned counsel) have presumed the regularity of government prosecutions. Prosecutors are normally given the benefit of the doubt when it comes to cases they choose to bring. They can bring charges against certain individuals and not others without scrutiny. They just cannot do so for protected reasons. When they improperly filed a false and misleading document, the "Motion to Impose Certain Conditions," however, the DOJ forfeited this presumption. Not only is this case one of

the minority of cases that fall squarely within the Supreme Court's framework against selective prosecution, but it is also unique in its application of a specific government policy to a community of individuals that, in the government's view, fits a stereotype involving individuals of Hispanic and/or Mexican descent.

Being Mexican is part of Mr. Rovirosa's identity, just like it is part of the Houston story. It got him indicted in this case. The community and this Court should not stand for the government's actions. This case should be dismissed.[16]

<u>**CONCLUSION**</u>

The DOJ, as Justice Sutherland wrote in *Berger v. United States*, 295 U.S. 78, 88 (1935), cannot use such improper methods to win a case:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to

---

[16] To the extent the Court believes additional investigation is required into the selective prosecution violations, defendant suggests the Court order the government to disclose: (1) charging decisions and dismissals for all FCPA matters from February 2025 to present, including the race/nationality of individuals charged, declined, dismissed, and any cartel related organizations (including TCOs), nationwide trends on prosecutions of cases with a "cartel" narrative, including racial statistics of defendants, DOJ approvals, internal emails, correspondence, memos, and other communications (including text messages between prosecutors, government agents/investigators), regarding "cartel" terminology, the "cartel" press release; (2) DOJ communications (including emails and text messages) and memos concerning the filing of the "Motion to Impose Certain Conditions of Release" [ECF 11] and/or communications regarding inclusion of cartel information, misstatements concerning connections to Houston area, and/or any other communications regarding defendants nationality, skin color, and/or any other remarks that potentially violated Mr. Rovirosa's civil rights; (3) communications (including text messages) surrounding the Sunday, August 10, 2025 arrest of Mr. Rovirosa; including justifications for a non-weekday arrest; communications (including emails) on detention (including any race-related reasons), and any other race-related communications involving government actors, communications with agents and prosecutors during and after arrest regarding the arrest of Mr. Rovirosa, his wife, or other efforts involving his family; (4) any approvals (written or oral) obtained by the Deputy Attorney General or Attorney General, or delegates, under 28 CFR § 50.2 and/or any communications of the same regarding (1) – (3).

refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

The government, in a shocking effort to win at all costs, violated Mr. Rovirosa's constitutional rights in three separate, independent ways. The right thing for the DOJ to do here would be to concede error—to admit they made a grievous mistake with Mr. Rovirosa's case and dismiss it.

They won't. They can't. Too much depends on the case for these prosecutors as the "first ever" cartel FCPA case. They believe they have set their landmine and can now win with their text message FCPA case. It is up to the Court to protect Mr. Rovirosa's rights, uphold the Constitution, and dismiss the indictment.

Respectfully submitted,

R. MCCONNELL GROUP

By: /s/ Ryan D. McConnell
    **Ryan D. McConnell**
    Texas Bar No. 24051020
    **Matthew S. Boyden**
    Texas Bar No. 24113620
    **Lawrence D. Finder**
    Texas Bar No. 07007200
    5850 San Felipe, Suite 500
    Houston, Texas 77057
    Telephone: 713.224.5775
    ryan@rmcconnellgroup.com

## CERTIFICATE OF SERVICE

On September 8, 2025, the foregoing was served on all counsel of record via the ECF filing system.

/s/ Ryan D. McConnell
Ryan D. McConnell