**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **V.** | § | **CRIMINAL ACTION NO.** |
| | § | **4:25-CR-00415** |
| **RAMON ALEXANDRO ROVIROSA** | § | |
| **MARTINEZ** | § | |

## DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Ramon Alexandro Rovirosa Martinez ("Mr. Rovirosa"), by and through undersigned counsel, pursuant Fed. R. Crim. P. 29(c), hereby submits his *Motion for Judgment of Acquittal.*

The guilty verdicts entered in this action on December 5, 2025, must be set aside, and a judgment of acquittal must be entered, for the following reasons:

1. The Government failed to meet its burden of proof that Mr. Rovirosa participated in a conspiracy, in violation of 18 U.S.C. § 371, and committed violations of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, et seq. ("FCPA"). Specifically, the Government did not present sufficient evidence to establish: (A) that there was an agreement among Mr. Rovirosa and the alleged co-conspirators to commit a violation of the FCPA; (B) that Mr. Rovirosa knew of any unlawful purpose of any agreement to violate the FCPA or joined in any agreement to violate the FCPA willfully; (C) that there was a connection between Mr. Rovirosa and the entities that benefited from the allegedly illegal payments; (D) that Mr. Rovirosa knew about and/or authorized the

allegedly illegal payments to any foreign official; (E) that any offer to pay, payment, promise to pay, or authorization of payment was for the purpose of influencing any act or decision of a foreign official in his official capacity; inducing such foreign official to do or omit to do any act in violation of the lawful duty of such foreign official; securing any improper advantage; or inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government (in this case, PEMEX, Mexico's state owned petroleum corporation); (F) that Mr. Rovirosa acted knowingly or willfully; and (G) that jurisdiction is proper in the Southern District of Texas.

2. The Government presented evidence to the jury that was either not properly admitted into evidence and/or that should not have been admitted into evidence.

   A. The jury was allowed to hear the recording of an interview between Mr. Rovirosa and ICE agents that was not admitted into evidence and which the Government relied on (and mischaracterized) in its arguments and during its presentation of the evidence. The interview did not address the issues that were alleged in the Indictment and thus served to constructively amend the Indictment. Further, the recording included unredacted, objected-to hearsay statements by the co-defendant that violated *Bruton v. United States*, 391 U.S. 123 (1968).

   B. The jury was provided with text messages to and from alleged co-conspirators that were never properly admitted into evidence, and the Government never offered evidence to satisfy any legal exception to the hearsay rule.

C. The jury was provided with testimonial translations of text messages with no testimony by the translator, despite defense counsel's request and objection, in violation of the Confrontation Clause.

D. The Government presented the testimony of Carlos Espinosa Barba, a convicted felon with no direct knowledge of the facts of this case and whose testimony had no relevance to this case, to discuss PEMEX's policies and his money laundering conviction for participating in an unrelated bribery scheme, even though the witness had never been employed by PEMEX, he had no relevant information about the case, and his inflammatory testimony was severely prejudicial Mr. Rovirosa, in violation of Mr. Rovirosa's due process rights and Fed.R.Evid. 403.

E. The Government did not provide Mr. Rovirosa and his counsel with the forensic images of his own cell phone and the cell phone and iPad of Mario Avila, nor other cooperators who had provided statements and information relevant to Mr. Rovirosa's defense, despite multiple requests by counsel, thereby depriving Mr. Rovirosa of his right to inspect the evidence used against him by the Government at trial and develop exculpatory information necessary for his defense.

F. The Government called a purported expert who had never been qualified as an expert, was not an expert, and whose testimony created evidence instead of explaining it, in violation of Fed.R.Evid. 702, when the Government did not have a witness from PEMEX of any other fact witnesses in the case.

These errors will be discussed in detail below.

## BRIEF PROCEDURAL BACKGROUND

Mr. Rovirosa was indicted on August 6, 2025. Following Mr. Rovirosa's arrest and release on bond, and after a change in counsel for the defense, the Court set the trial date for October 6, 2025. (Doc. No. 15).  The trial date was eventually postponed until December 1, 2025. (Doc. No. 86).

In the interim, counsel for the defense filed motions in limine setting forth Mr. Rovirosa's objections to the Government's evidence on various grounds, most of which are discussed in this Motion. Counsel also filed motions to dismiss the Indictment, which were denied by this Court.

The Court conducted status/pretrial conferences on September 29th, October 2nd, October 6th, and October 20th. Following the October 20th status conference, the Court entered an order stating that "that the government's offer of translations of the emails, messages and/or communications that are appropriately certified pursuant to FRE 604 are admitted." (Doc. No. 74)

In an order dated October 21, 2025, the Court stated as follows: "the government is DIRECTED to provide an exhibit list and the attendant exhibits on the Friday before the beginning of trial. In like manner, the defendant is DIRECTED to provide notice of any objections to individual objections to the government exhibits, i.e., email, text message and WhatsApp on the Friday before the beginning of trial relating particularly to translation disputes." (Doc. No. 77). Mr. Rovirosa's objections to the Government's exhibits, which were sent directly to the court via email, were provided to the Court on Friday, November 28, 2025.[1]

---

[1] The email to the court with the attached exhibits are attached hereto as Exhibit 1.

On December 1, 2025, the first day of trial, the Court stated that it would "provisionally admit the email exchanges that the Government has offered – is offering – in the evidence." (Tr. Transcript p. 9). The Court explained that this meant that "if you choose to use one of the documents or a witness is testifying you will not need to offer that document into evidence." Id. This was a "provisional admission" that meant that the documents were for "use in court." Id. The Court subsequently allowed the Government to play the full audio of the 90-minute surreptitiously recorded interview of Mr. Rovirosa by ICE agents but held that the transcript could not go back to the jury. (Tr. Transcript p. 200).

On December 3rd, after the close of all evidence, the Court instructed the parties to present a list of documents that were admitted into evidence and to provide a hard copy to the courtroom case manager, which could also be provided via email. (Tr. Transcript pp. 743-744). The exhibits were provided to the jury the following day. The recording of Mr. Rovirosa's interview was not included with the exhibits.

On December 4th, prior to closing arguments, defense counsel moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The Court took the matter under advisement. (Tr. Transcript p. 820). On the same date, the Court denied the motion, finding that "sufficient evidence has been admitted such that the jury should decide the propriety of the evidence in relation to each Count of the Indictment." The present motion follows the jury's convictions on three of the four counts of the Indictment.

## CASE OVERVIEW

The trial of the Government's case was built on a false and misleading narrative and the improper use of inadmissible evidence. In opening statement, the Government relied heavily on a surreptitiously recorded interview of Mr. Rovirosa and told the jury that he "even

told law enforcement he knew it was wrong to pay bribes." (Tr. Transcript, p. 190). That assertion was misleading and prejudicial.

The recorded interview was inadmissible Rule 404(b) evidence and contained hearsay statements by a co-defendant that should have been barred from admission under *Bruton*. More importantly, the Government misstated its substance. Mr. Rovirosa did not admit to paying bribes. What he actually said was that he understood it would be wrong for Roma Energy—an uncharged entity wholly unrelated to the Indictment—to pay bribes of any kind. By presenting that statement as an admission of personal wrongdoing, the Government deliberately invited the jury to believe that Mr. Rovirosa had confessed to the charged conduct when, in fact, he had not.

This framing was not accidental. Throughout opening statement, the Government argued its case rather than previewing evidence, repeatedly characterizing conduct as "bribery"—a term not charged in the Indictment—and interpreting text messages for the jury before any witness testimony. The clear objective was to tie Mr. Rovirosa's inadmissible statement to the charged offenses and to present it as a confession by implication.

That false narrative continued throughout the trial. Through a handful of witnesses, the Government introduced a limited number of text messages and records and asked ICE agents—who had no personal knowledge of the communications, the parties, or the alleged transactions—to speculate about their meaning. Those agents were invited to interpret cryptic messages and to portray Mr. Rovirosa and his co-defendant as participants in a long-running international bribery scheme, despite the absence of direct evidence supporting that conclusion.

The Government repeatedly used the 90-minute surreptitiously recorded interview to "glue" its case together, even though the recording was never admitted into evidence, never transcribed into the trial record, and never provided to the jury during deliberations. Instead, the jury was forced to rely entirely on the Government's characterizations of the statement. That statement contained inadmissible and undisclosed Rule 404(b) material concerning Roma Energy and co-defendant Avila's *Bruton*-barred allegations. Even the Government's lead investigative agent, Matthew Wood, conceded that the statement did not concern the conduct charged in the Indictment. (Tr. Transcript p. 337).

Compounding the prejudice, another Government agent acknowledged that complete forensic images of Mr. Avila's and Mr. Rovirosa's devices existed and had never been produced to the defense. Thus, while the Government relied on selective extractions and speculative interpretations, it simultaneously withheld the very evidence that could have tested or refuted the Government's evidence and its criminal allegations.

The trial concluded with testimony from witnesses who could not supply the missing proof. The Government presented an "expert" to address PEMEX's status as a foreign governmental entity despite his admission that he had reviewed no evidence in the case and lacked familiarity with PEMEX or the alleged conduct. The final witness was a convicted felon who testified about his own criminal conduct and the purported impact of corruption on PEMEX, even though this witness had never worked for PEMEX and had no connection to Mr. Rovirosa or the charged offenses.

When the improper character evidence, speculative agent testimony, and guilt-by-association are stripped away, the Government's case is precisely what it promised: thousands of text messages, untethered to context, with only prosecutors explaining what the messages

supposedly mean. Mr. Rovirosa's convictions were not based on admissible evidence proving knowledge, intent, agreement, or purpose. His convictions were based on mischaracterized statements, association with convicted criminals, and prosecutorial narrative. The trial process and resulting convictions therefrom violated fundamental principles of due process and thus cannot stand.

## LEGAL ANALYSIS

*Standard for Rule 29(c) Motion for Acquittal*

Under Federal Rule of Criminal Procedure 29(c), a defendant may file a motion for judgment of acquittal within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. In determining whether to grant or deny a motion for judgment of acquittal, federal courts apply the standard set forth in *Jackson v. Virginia,* 443 U.S. 307 (1979), that is, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt while viewing the evidence in the light most favorable to the prosecution. Courts may not weigh evidence or consider credibility of witnesses when reviewing sufficiency of evidence. *Id.*

I.    <u>The Government Failed To Meet Its Burden Of Proof That Mr. Rovirosa Conspired To Commit And Committed A Violation Of The FCPA</u>

As set forth above, the totality of the Government's allegations of conspiracy and FCPA violations relied on uncorroborated text messages that were badly translated from the original Spanish. The Government did not present **any** witnesses that had direct knowledge of the facts alleged in the Indictment. The Government did not go through the exhibits with the jury during the trial itself. Instead, the Government provided a "data dump" of exhibits at the close of trial—the vast majority of which had not been discussed by any trial witness—and then

presented its "evidence" for the first time in its closing argument, which defense counsel could not properly rebut. As set forth in detail below, the text messages in and of themselves were insufficient to prove the violations alleged in the indictment beyond a reasonable doubt.

A.      *The Government Did Not Offer Sufficient Evidence To Establish That There Was An Agreement Among Mr. Rovirosa And The Alleged Co-Conspirators To Commit A Violation Of The FCPA.*

The only evidence the Government offered to support its allegation of a conspiracy consisted of text messages admitted into evidence, none of which reflected any communication between Mr. Avila and Mr. Rovirosa. The Government failed to prove a single message exchanged between the alleged co-conspirators. Indeed, the Government's own agent conceded that Mr. Avila's phone had been seized in 2021, and thus any communications between Mr. Rovirosa and Mr. Avila before that time were preserved after the seizure.[2] The evidentiary record definitively established the complete absence of communications between Mr. Avila and Mr. Rovirosa.

The Government further relied on only two categories of records to suggest that an exchange of value had occurred: (1) lawful transfers from a company not shown to be owned or controlled by Mr. Rovirosa to individuals associated with Mr. Avila, and (2) a record reflecting Mr. Avila's purchase of a treadmill. No exhibit linked either transaction to bribery, to PEMEX officials, or to Mr. Rovirosa.

---

[2] Although the Government  speculated that messages may have been deleted after Mr. Avila's phone was seized in 2021, Mr. Avila's phone would have contained any messages that would have been subsequently deleted on another device.  Accordingly, the Government's speculation that messages were deleted is contradicted by its own evidence; no deletions were shown, and no testimony or exhibit supported that theory.

Despite this record, the Government misstated during closing argument that transaction records corroborated that Mr. Rovirosa paid for the treadmill. The jury submitted a note concerning this issue, underscoring its significance. (Jury Note No. 2, Doc. No. 99). That assertion was false, as demonstrated by the admitted exhibits.

None of the evidence presented at trial was sufficient to establish an agreement or shared knowledge between Mr. Rovirosa and Mr. Avila. The Government never proved context, authorship, or meaning for the messages on which it relied. Instead, it attempted to fill these evidentiary gaps by mischaracterizing an unadmitted recorded interview as a concession that Mr. Rovirosa paid bribes when, in fact, the statement concerned only the possibility that Roma Energy may have made improper payments. That recording was not admitted into evidence and thus should not have been considered by the jury. The Government's case thus rested on speculation, assumption, and impermissible character inferences rather than admissible proof of conspiracy or substantive FCPA violations.

B.   *The Government Did Not Offer Sufficient Evidence That Mr. Rovirosa Knew Of Any Unlawful Purpose Of Any Agreement To Violate The FCPA Or Joined In Any Agreement To Violate The FCPA Willfully.*

Absent any corroboration of the Government's highly speculative interpretation of isolated text messages, there is no evidence that Mr. Rovirosa was aware of, participated in, or agreed to anything allegedly undertaken by Mario Avila. The record contains not a single communication between the two men. Nor does it contain any bank record, financial document, or third-party testimony corroborating the Government's interpretation of the messages it presented.

Critically, the Government did not establish its conspiracy theory through evidence admitted at trial. Instead, that theory emerged for the first time during closing argument, when

prosecutors strung together unrelated messages and invited the jury to infer meaning, intent, and agreement—at a point when Mr. Rovirosa had no opportunity to cross-examine witnesses, challenge assumptions, or test the Government's narrative through evidence. Argument is not evidence, and a prosecutor's closing argument cannot supply proof that the trial record lacks.

The Government's closing presentation relied heavily on material that was either impermissible or mischaracterized: an unadmitted recorded interview that did not concern the charged conduct; guilt by association testimony by Carlos Espinosa Barba, a convicted felon in an unrelated case who had no connection to Mr. Rovirosa; and factual misstatements concerning financial records that were not supported by the admitted exhibits. (Tr. Transcript pp. 955-956; Series "600" Exhibits; Jury Note No. 2, Doc. No. 99).

In short, the Government asked the jury to convict not on evidence establishing knowledge or agreement, but on speculation layered atop character inferences and prosecutorial argument. That approach cannot satisfy the Government's burden of proof and deprived Mr. Rovirosa of his right to a verdict based solely on admissible evidence tested through the adversarial process.

C. *The Government Did Not Offer Sufficient Evidence To Show Any Connection Between Mr. Rovirosa And The Entities That Allegedly Benefitted From The Allegedly Illegal Payments*.

On cross-examination, Special Agent Sanchez conceded that there was no evidence establishing a connection between Mr. Rovirosa and the charged entities. (Trial Tr. at 619-620]. No witness testified that Mr. Rovirosa owned, controlled, managed, or directed any of those entities, and no admitted exhibit established such a relationship.

Rather than proving this essential link through evidence, the Government relied in closing argument on its interpretation of text messages to suggest a connection that the trial

record did not support. Compounding the problem, the Government submitted to the jury—over defense objection—an unadmitted and improper document listing various entities and individuals, thereby providing the jury with an artificial framework through which to infer relationships that were never established at trial. (Tr. Transcript, p. 544; Exhibit 602).

The prejudicial impact of this error was confirmed when the jury submitted a note specifically asking about the relationship between Mr. Rovirosa and the entities listed. (Jury Note No. 2, Doc. No. 99). That question underscored what the evidence failed to show: no such connection existed, and none was proven through testimony or exhibits.

The Court itself recognized this evidentiary gap, observing that the Government had not established a foundational link between Mr. Rovirosa and the charged entities. (Tr. Transcript, pp. 498-501). This missing element was not a minor deficiency; rather, it went to the heart of the Government's theory of liability. As the defense argued in its Rule 29 motion, the absence of proof connecting Mr. Rovirosa to the charged entities required judgment of acquittal and should have precluded submission of the case to the jury. (Tr. Transcript, pp 807-810).

> D. *The Government Did Not Offer Sufficient Evidence To Establish That Mr. Rovirosa Knew About And/Or Authorized The Allegedly Illegal Payments To Any Foreign Official*.

To sustain a conviction under the charged offenses, the Government was required to prove beyond a reasonable doubt that Mr. Rovirosa knew of and authorized the allegedly illegal payments to a foreign official. The trial record contains no such evidence.

The Government did not present a single witness who testified that Mr. Rovirosa directed, approved, or even discussed any payment to a foreign official. Nor did it introduce any document—email, text message, contract, bank record, or internal company

communication—showing that Mr. Rovirosa authorized or had knowledge of any improper payment. Critically, there was not a single communication introduced at trial between Mr. Rovirosa and Mario Avila concerning payments, officials, or anything resembling bribery.

The Government instead relied on isolated text messages among third parties and asked the jury to infer Mr. Rovirosa's knowledge and authorization through speculation. But none of those messages referenced Mr. Rovirosa, none established his awareness of the alleged payments, and none demonstrated that he exercised control over the individuals or entities involved. The Government never proved authorship, context, or meaning for those messages sufficient to transform them into evidence of knowledge or intent.

The absence of corroboration was particularly glaring with respect to financial evidence. The Government introduced no bank record showing that Mr. Rovirosa funded, reimbursed, approved, or otherwise facilitated any allegedly illegal payment. The few financial records admitted reflected lawful transfers from entities not shown to be owned or controlled by Mr. Rovirosa, or purchases made by others without any evidentiary link to him. No witness testified that any payments were made at Mr. Rovirosa's direction or with his approval.

Unable to prove knowledge or authorization through admissible evidence, the Government attempted to fill this gap through improper means. During closing argument, it relied heavily on an unadmitted recorded interview that did not concern the charged conduct and, at most, referenced the possibility that Roma Energy—not Mr. Rovirosa—may have engaged in improper payments. The Government also relied on guilt by association by invoking testimony from a cooperating witness convicted in an unrelated case who admitted he did not know Mr. Rovirosa and had no knowledge of his conduct.

Closing argument, however, is not evidence. Prosecutorial speculation cannot substitute for proof, and character inferences cannot establish the essential elements of knowledge and authorization. Where, as here, the record contains no evidence that Mr. Rovirosa knew of or authorized any payment to a foreign official, the Government has failed to meet its burden. The convictions therefore cannot stand.

E. *The Government Had No Witness From PEMEX And Did Not Offer Sufficient Evidence That Any Offer To Pay, Payment, Promise To Pay, Or Authorization Of Payment Was For The Purpose Of (i) Influencing Any Act Or Decision Of A Foreign Official In His Official Capacity; (ii) Inducing Such Foreign Official To Do Or Omit To Do Any Act In Violation Of The Lawful Duty Of Such Foreign Official; (iii) Secure Any Improper Advantage; Or (iv) Inducing Such Foreign Official To Use His Influence With A Foreign Government Or Instrumentality Thereof To Affect Or Influence Any Act Or Decision Of Such Government Or Instrumentality To Assist The Domestic Concern.*

The Government failed to present sufficient evidence to establish the statutory purpose element required for conviction. It did not call a single witness from PEMEX—or from any PEMEX subsidiary—who testified that any offer, payment, promise to pay, or authorization of payment was made for the purpose of influencing an official act, inducing a violation of lawful duty, securing an improper advantage, or causing a foreign official to use his influence with a government instrumentality. The absence of such testimony is fatal to the Government's case.

As the defense repeatedly argued before and during trial, the Government's proof was defined by whom it did not call. No PEMEX official testified regarding any decision, act, omission, or exercise of influence allegedly affected by an improper payment. No witness testified that any contract, audit, procurement decision, or business outcome was altered because of an offer or payment attributed to Mr. Rovirosa. The Government therefore failed

to present evidence on the central statutory question: *What official act was influenced, and for what purpose*?

Instead of calling witnesses with personal knowledge, the Government relied heavily on Carlos Espinosa Barba. In its opening statement, the Government previewed Barba's testimony by telling the jury: "You'll hear from Carlos Espinosa Barba, who worked at PEMEX for over a decade until he got caught taking bribes in a separate case." (Tr. Transcript, p. 179). This framing made clear the role Barba was intended to play—not as a witness to Mr. Rovirosa's conduct, but as a vehicle for association with corruption.

That preview proved accurate. Barba admitted that he did not know Mr. Rovirosa, had no involvement in the charged conduct, and possessed no personal knowledge of any alleged offer, payment, promise, or authorization at issue in this case. His testimony concerned his own criminal conduct in an unrelated prosecution and generalized descriptions of bribery elsewhere. As defense counsel warned the Court, Barba's testimony invited the jury to infer guilt by association rather than supplying evidence of any statutory element.

The Government likewise relied on David Lopez, who it presented as a witness to explain PEMEX's structure and operations. Lopez, however, was not qualified as an expert, admitted that he reviewed no evidence beyond the indictment, and had no personal knowledge of any alleged transactions in the case. He did not participate in any alleged payment, did not observe any interaction with foreign officials, and could not testify as to the purpose or effect of any alleged offer or payment. As the defense argued at trial, Lopez's testimony impermissibly blurred the line between fact and expert opinion while establishing none of the statute's required elements.

F.    *The Government Did Not Offer Sufficient Evidence To Prove Mr. Rovirosa Acted Knowingly Or Willfully.*

The Government was required to prove beyond a reasonable doubt that Mr. Rovirosa acted knowingly and willfully—that is, that he knew his conduct was unlawful and intentionally engaged in it. The trial record does not support such a finding.

The Government did not present a single witness who testified that Mr. Rovirosa knew of any allegedly improper payment, knew that any payment was intended for a foreign official, or understood that any conduct at issue violated the law. Nor did the Government introduce any communication in which Mr. Rovirosa acknowledged the illegality of any act, discussed evading the law, or otherwise demonstrated awareness that his conduct was unlawful.

Although the Government introduced text messages extracted from Mr. Rovirosa's phone, it failed to establish that any of those messages reflected knowledge of, or intent to engage in, bribery. None of the messages referenced a foreign official, an improper payment, or an intent to influence an official act. The Government did not prove the context in which the messages were sent, how they related to any charged conduct, or why they should be interpreted as evidence of criminal intent rather than lawful business communications.

The Government likewise failed to establish willfulness. It introduced no evidence that Mr. Rovirosa understood the FCPA or its prohibitions, no evidence that he attempted to evade compliance mechanisms, and no evidence that he sought to conceal conduct from regulators or law enforcement. To the contrary, the evidence showed that the companies involved were legitimate enterprises engaged in ordinary commercial activity—facts that undermine any inference of deliberate criminal intent.

Unable to prove knowledge or willfulness through admissible evidence, the Government relied on improper substitutes during closing argument. Prosecutors characterized an unadmitted recorded interview as a confession, despite the fact that the statement concerned uncharged conduct and, at most, referenced the possibility that Roma Energy—not Mr. Rovirosa—may have engaged in improper payments. The Government also relied on guilt by association, invoking the criminal conduct of Carlos Espinosa Barba, a cooperating witness in an unrelated case who admitted he did not know Mr. Rovirosa and had no knowledge of his conduct.

Closing argument is not evidence, and speculation cannot substitute for proof of mens rea. The Government's burden was to establish that Mr. Rovirosa himself acted with knowledge and willfulness. Because the record contains no evidence supporting such a finding, the convictions cannot stand.

G. *The Government Did Not Offer Sufficient Evidence To Prove That Jurisdiction Is Proper In The Southern District Of Texas.*

The Government failed to present sufficient evidence establishing that venue and jurisdiction are proper in the Southern District of Texas. No witness testified that any act in furtherance of the charged offenses occurred in this district, and no exhibit demonstrated that any allegedly unlawful conduct had a meaningful nexus to the Southern District of Texas.

The Government did not offer testimony connecting the alleged conspiracy, any purported payment, or any decision-making process to this district. No witness testified that Mr. Rovirosa authorized, directed, or knew of any allegedly improper conduct while located in the Southern District of Texas. Nor did the Government present evidence that any foreign official was contacted, influenced, or paid from within this district.

The Government attempted to bridge this evidentiary gap through limited geolocation testimony concerning text messages. That testimony, however, failed to establish jurisdiction. The Government did not prove that any geolocated message was related to the charged conduct, furthered the alleged conspiracy, or concerned any offer, payment, promise, or authorization at issue in the Indictment. The record contains no evidence tying any particular message—sent from any location—to an element of the charged offenses.

This deficiency was especially significant because the entities named in the Indictment were undisputedly legitimate companies engaged in lawful business activities. The Government presented no evidence that these companies were shell entities, sham vehicles, or otherwise created to facilitate criminal conduct. Absent such proof, the mere existence of routine business communications or financial activity—without evidence linking them to the charged offenses—cannot establish venue or jurisdiction in this district.

Moreover, the Government failed to show that any communication occurred at a specific time, from a specific location within the Southern District of Texas, and for the purpose of advancing the alleged criminal scheme. No witness testified as to when or where any alleged agreement was formed, when any alleged authorization occurred, or how any alleged act in furtherance of the conspiracy was connected to this district. The Government's case thus lacked the temporal and geographic specificity necessary to establish jurisdiction.

In short, the Government asked the jury to assume jurisdiction based on generalized location data and lawful business activity, rather than proving that an essential element of the charged offenses occurred in the Southern District of Texas. Because the Government failed to present evidence establishing venue and jurisdiction, the case should not have been submitted to the jury, and thus a judgment of acquittal is required.

II.     *The Government Presented Evidence To The Jury That Was Either Not Properly Admitted Into Evidence And/Or That Should Not Have Been Admitted Into Evidence*.

During trial, the Government offered, and the Court admitted, evidence that should have been excluded. Further, the Government was allowed to present evidence to the jury that was not ultimately admitted into evidence. Without the improperly admitted evidence, the Government would have had little to no evidence to support any conviction.

A. *The Secretly Recorded Interview Of Mr. Rovirosa*

As a first matter, the jury was allowed to hear a secretly recorded interview between Mr. Rovirosa and ICE agents that was not admitted into evidence and which the Government relied on (and mischaracterized) in its arguments and during its presentation of the evidence. On multiple occasions prior to and during trial, defense counsel objected to the statement on the basis that the comments were taken out of context and that they contained hearsay statements of Mr. Avila that would be in violation of *Bruton*. At trial, the Government had initially sought to present only certain out-of-context snippets of the recorded interview. Defense counsel reiterated its objections to selected snippets of the interview coming into evidence. In the end, the Court allowed the whole recording to be played but stated that transcripts of the recording would not be admitted into evidence. (Tr. Transcript p. 200).

Mr. Rovirosa submits that it was error to allow the recording to be played if the recording was not admissible into evidence, and that such error was not harmless. In the recorded interview, Mr. Rovirosa was asked about his company, Roma Energy, which is located in Texas. Mr. Rovirosa was asked about activities that were unrelated to the allegations of the Indictment. The agents pressed Mr. Rovirosa regarding any bribes that he may have paid or that people in his company may have paid. Mr. Rovirosa denied ever having paid bribes but

acknowledged the possibility that bribes may have originated from employees of Roma Energy—which was not charged in the Indictment—while working in Mexico.

The Government, however, sought to use the recording as an admission of guilt, going so far as to state in its Opening Statement that it would hear that Mr. Rovirosa was aware his company was paying bribes. The Government referred to the recording again in its Closing Argument (Tr. Transcript, p. 904) as evidence that Rovirosa had personal knowledge of the bribes in his company.

The trial court had ample grounds to deny admission of the recording into evidence. Firstly, the interview did not involve the subject matter of the indictment, and thus it was irrelevant. Secondly, the interview contained impermissible hearsay statements by Mr. Avila, the co-defendant, which were in violation of *Bruton.* Thirdly, the Government, to the extent that it intended to use the recorded interview as "other bad acts" evidence pursuant to Fed.R.Evid. 404(b), failed to give Defendant the notice of the intended use required under that Rule. Finally, the admission of the interview would have impermissibly expanded the scope of the Indictment to include conduct that was not charged.

Because the recording was not admissible, playing it to the jury served only to confuse the jury as to what conduct was actually charged. And because the Indictment was not sent back to the jury during deliberations, the jury had little guidance regarding the allegations in the case.[3]

---

[3] In fact, the jury verdict shows the confusion caused by the Government's "trial by ambush" strategy and was an incomprehensible outcome given that jury did not have the Indictment nor any direction or instructions for Counts 2-4 of the Indictment, yet returned a guilty verdict on two counts, and not guilty on one count.

The importance of the recording to the jurors' deliberations is evidenced by the note that was sent during deli0berations requesting a transcript of the recorded interview. (Jury Note No. 1, Doc. No. 98). Notably, this Court elected not to provide a limiting instruction regarding the non-admitted evidence and thus the jury would likely have felt that they were bound to consider the recording as evidence. Because the recording was the only time the jury heard from anyone actually named in the indictment, it would have doubtlessly been a subject of debate among the jurors.

This was not harmless error. The recorded interview served as the linchpin of the Government's closing narrative and was used to supply proof that the admitted evidence did not provide. Once that improperly presented material is removed from consideration, little remains to support the verdicts. The Government's presentation and use of this evidence therefore affected Mr. Rovirosa's substantial rights and denied him a fair trial, requiring a judgment of acquittal.

B. _The Text Messages In And Of Themselves Do Not Establish a Prima Facie Case of Conspiracy_

As set forth above, the Government, at the end of trial, dumped almost all of its exhibits on the jury during the closing argument, the only time that the exhibits were actually presented to the jury. At that time, the jury was informed of text messages to and from alleged co-conspirators that were never properly admitted into evidence and the Government never offered evidence sufficient to satisfy any legal exception to the hearsay rule.

This is seen in the text messages between Avila and Núñez in which they discussed audits involving PEMEX and how the audits were affecting the ability to collect the amount owed on an existing contract with PEMEX. Notably absent from these text messages is Mr.

Rovirosa. He was not a party to any of the text messages between Avila and Núñez. It is clear from his own messages that Mr. Rovirosa was aware of the audit and collection issues, and aware of the efforts to get the audit resolved by working with PEMEX employees to negotiate the matter. However, there is nothing in any of the text messages showing that Mr. Rovirosa had agreed to pay Núñez or anyone else to procure a contract with or any other benefit from PEMEX. Furthermore, the Government did not produce any other evidence (other than the texts themselves, which have little probative value without a party to the conversation actually explaining what was going on behind the texts) to show that the funding was authorized by Mr. Rovirosa or that Mr. Rovirosa knew what the funds were to be used for. The texts between Avila and Núñez may be evidence of a conspiracy between the two of them, but not enough to show that Mr. Rovirosa was a knowing participant in illegal conduct. Because the text messages do not provide a prima facie case of a conspiracy involving Mr. Rovirosa, the co-conspirator exception to the hearsay rule does not apply and Exhibits in the 200 series should not have been admitted or considered.

Similarly, the Government tendered and the Court admitted voice messages left on Avila's phone. However, the Government presented no witnesses to verify the identity of the voice of the person leaving the voice messages. Because the speakers were not properly identified, the voice messages (Exhibits in the 200 series) should not have been admitted into evidence.

C. *The Jury Was Provided With Testimonial Translations Of Text Messages With No Testimony By The Translator, Despite Defense Counsel's Objection, In Violation Of Mr. Rovirosa's Right To Call And Confront Witnesses In His Defense.*

After receiving the Government's translated text messages, defense counsel challenged the reliability and accuracy of those translations and sought to require the Government to

present testimony from one of its translators at trial. That request was based on counsel's review of the translations, identification of discrepancies and ambiguities, and concerns regarding the overall quality and consistency of the translated material.

At the October 6, 2025, hearing, counsel for Mr. Rovirosa explained that the defense was not seeking to introduce its own translation evidence, but rather to test the reliability of the Government's translations by requiring the Government to call a translator as a witness. Defense counsel cited Judge Barkett's opinion in *United States v. Charles*, 722 F.3d 1319 (11th Cir. 2013), and argued that where translations function as substantive evidence, the defense must be afforded an opportunity to examine the process by which they were prepared. (Tr. Transcript, pp. 24–25).

Notwithstanding these arguments—and despite concerns raised regarding the certifications and methodology underlying the translations—the Court denied the request without addressing the core issue raised by the defense: that the Government was permitted to place translated statements before the jury without producing a witness subject to cross-examination. *See* Order on Admissibility of Certified Translations, entered October 21, 2025 (Doc. No. 74).

The prejudice from that ruling became apparent during deliberations, when the jury submitted a note requesting the original Spanish-language versions of the text messages. (Jury Note No. 1, Doc. No. 98). That request was denied. The jury's inquiry demonstrates that at least some jurors questioned the accuracy or completeness of the English translations and sought to review the original language to better understand the meaning and context of the conversations. The accuracy of the translations was particularly critical in this case because the Government did not call any witnesses who were parties to the text message conversations

and therefore could not explain the meaning, intent, or context of cryptic or ambiguous exchanges. As a result, the translated text messages served as the primary—and in some instances the only—evidence of what the communications allegedly conveyed.

By allowing the Government to rely on translated text messages as substantive evidence without requiring the Government to produce a translator for examination, the Court denied Mr. Rovirosa the opportunity to test the reliability of that evidence. This ruling prevented meaningful confrontation and deprived Mr. Rovirosa of his Sixth Amendment right to confront the witnesses against him and to challenge the reliability of the evidence presented to the jury.

Under these circumstances, the admission of the translated text messages without translator testimony violated the Federal Rules of Evidence and the Sixth Amendment and substantially prejudiced Mr. Rovirosa's right to a fair trial.

D. *The Government Should Not Have Been Allowed To Present The Testimony Of A Convicted Felon With No Direct Knowledge Of The Facts Of This Case.*

At trial, over defense counsel's objection, the Government called Carlos Espinosa Barba, a federally convicted felon awaiting sentencing, to discuss PEMEX's policies and his money laundering conviction for participating in an unrelated bribery scheme. Barba had never been employed by PEMEX in Mexico, only a subsidiary in Houston, and thus was not qualified to give any testimony on the policies or inner workings of that organization. Despite this obvious lack of knowledge, Barba testified regarding what would be allowed/not be allowed at PEMEX, including conduct that the Government alleged was in violation of the FCPA in Mr. Rovirosa's case, even though Barba was not an expert and had absolutely no connection to Mr. Rovirosa or this case.  Barba's testimony as a whole was intended to convey the message that since Barba had "owned up" to his crime, Mr. Rovirosa should as well.

Barba's testimony and the inherent message it was intended to convey was inflammatory and severely prejudiced Mr. Rovirosa, violating both his due process rights and Fed. R. Evid. 403.

As defense counsel argued at trial, Barba's testimony functioned as classic guilt-by-association evidence. It encouraged the jury to substitute generalized notions of corruption and moral judgment for proof beyond a reasonable doubt of the charged conduct. The inherent message conveyed by Barba's testimony—that "this is how bribery works" and that culpability should be inferred by analogy—was inflammatory and misleading, particularly in a case where the Government lacked direct evidence of Mr. Rovirosa's intent or involvement.

Any minimal probative value of Barba's testimony was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Fed. R. Evid. 403. The testimony invited the jury to conflate Barba's unrelated criminal conduct with the allegations against Mr. Rovirosa and to convict based on character and association rather than admissible evidence. Its admission therefore violated both Rule 403 and Mr. Rovirosa's right to due process. Because Barba's testimony was untethered to the facts of this case and served only to inflame and prejudice the jury, its admission substantially affected Mr. Rovirosa's rights and independently warrants relief.

E. *The Government Refused To Provide Mr. Rovirosa And His Counsel With The Forensic Images Of Cell Phones And Other Electronic Devices Despite Multiple Requests By Counsel, Thereby Depriving Mr. Rovirosa Of The Right To Inspect The Evidence Used Against Him.*

Prior to trial, defense counsel sought copies of the forensic images of Mr. Rovirosa's cell phone, Avila's cell phone and iPad, as well as other forensic images from other cooperators who had information relevant to Mr. Rovirosa's defense. Despite the repeated requests, the Government refused to produce the forensic images. By withholding the

complete forensic images, the Government deprived Mr. Rovirosa of the ability to inspect the evidence used against him and to meaningfully challenge the Government's selective presentation of electronic communications. The Government introduced text messages and other data extracted from these devices yet denied the defense access to the underlying forensic images necessary to evaluate the completeness, context, and integrity of that data. Without access to the full images, the defense could not determine whether messages were missing, whether additional communications existed that undermined the Government's theory, or whether metadata contradicted the Government's timeline or interpretation.

This deprivation was particularly prejudicial given the technical complexity of modern forensic analysis. Reviewing raw message excerpts is not equivalent to analyzing a complete forensic image. The extraction, parsing, and interpretation of electronic data depend on proprietary software, algorithms, and filtering choices that can materially affect what data is displayed, how it is ordered, and what is omitted. Without access to the forensic images themselves, the defense was unable to retain an expert to independently evaluate the Government's methods or conclusions.

The withheld forensic images were material and potentially exculpatory. The Government's case hinged on the absence or presence of communications, the interpretation of isolated messages, and speculative inferences about coordination and intent. Full forensic images could have confirmed the absence of communications involving Mr. Rovirosa, provided exculpatory context to the messages the Government relied upon, or revealed additional data inconsistent with the Government's theory. The withholding of this evidence prevented the defense from discovering and developing exculpatory information necessary to present a complete defense.

By refusing to produce the forensic images while simultaneously relying on selective extractions from those same devices at trial, the Government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and deprived Mr. Rovirosa of his right to a fair trial. This discovery failure independently warrants relief and further underscores the cumulative prejudice resulting from the Government's evidentiary and trial errors.

F. *Presenting An Expert Who Was Never Qualified As An Expert, Was Not An Expert, In Violation Of Fed.R.Evid. 702, When The Government Did Not Have A Witness From PEMEX Or Any Fact Witnesses In The Case.*

In the absence of any witness from PEMEX or any fact witness with personal knowledge of PEMEX's structure or operations, the Government relied on the testimony of David Lopez, an attorney licensed in Texas, whom it presented as an expert witness. Over the defense's objection, the Court qualified Lopez as an expert based primarily on his status as a lawyer and his ability to read and interpret statutes. (Tr. Transcript, p. 531). The defense was not afforded a meaningful opportunity to conduct a Daubert hearing or otherwise examine the reliability of Lopez's methodology, assumptions, or opinions, in violation of Fed. R. Evid. 702.

Lopez was not qualified to offer expert opinions in this case. He had never testified as an expert in a federal criminal trial, had never testified in an FCPA case, and conceded that he had no personal knowledge of the facts underlying the charges. Prior to trial, Lopez admitted that he reviewed only the Government's indictment and the defense's motion in limine seeking to exclude his testimony. He did not review financial records, communications, contracts, or witness testimony, and there was no evidence admitted at trial upon which he could base expert analysis.

Instead of applying expertise to evidence, Lopez effectively created evidence. His testimony relied on generalized descriptions of PEMEX drawn from secondary sources, including publicly available materials and information obtained from the internet, rather than facts admitted at trial. Rule 702 does not permit an expert to substitute speculation or generalized background information for analysis grounded in the evidentiary record.

The unreliability of Lopez's methodology was not hypothetical. Courts have previously rejected Lopez's opinion testimony for precisely these reasons. In *In re Elamex, S.A. de C.V.*, 367 S.W.3d 891 (Tex. App.—El Paso 2012), the court excluded Lopez's opinions because they were based on assumed facts and speculation rather than reliable methodology. That same flaw was present here. Lopez reviewed only the indictment, assumed facts alleged by the Government were true, and offered opinions based on those assumptions—exactly the approach rejected in *Elamex*.

Lopez further conceded that his own published work had little to do with PEMEX, acknowledging that it mentioned PEMEX only in passing in the context of land rights. Day 3 Trial Tr. 675. He also initially misstated PEMEX's status as a monopoly and later conceded on cross-examination that the governing law had changed in 2013. Id. at 671–72. These concessions underscored the lack of reliability and relevance of his testimony.

The Government used Lopez's testimony to fill a critical evidentiary gap created by its failure to call any PEMEX witnesses. Rather than proving statutory elements through admissible fact testimony, the Government relied on Lopez's generalized assertions to suggest control, influence, and governmental status—issues central to its case. Allowing the Government to establish essential elements through unsupported expert opinion untethered to trial evidence deprived Mr. Rovirosa of his right to a fair trial.

The admission of Lopez's testimony violated Rule 702 and Daubert, and its prejudicial effect was substantial. By permitting the Government to present the PEMEX portion of its case through an unqualified expert who relied on assumptions and internet research rather than evidence, the Court allowed the jury to consider opinions that lacked reliability, relevance, and foundation. This error affected Mr. Rovirosa's substantial rights and independently warrants a judgment of acquittal.

## CONCLUSION

Based on the foregoing, the jury verdicts in this case should be vacated based on the lack of sufficient evidence and a judgment of acquittal entered in favor of Mr. Rovirosa.

Respectfully submitted,

BREAZEALE, SACHSE & WILSON

By: */s/ Catherine M. Maraist*
Pro Hac Vice
Louisiana Bar No. 25781
300 Main Street, Ste. 2300
Baton Rouge, LA  70801
Telephone: 225.381.3168
catherine.maraist@bswllp.com


R. MCCONNELL GROUP
By: */s/ Ryan D. McConnell*
Ryan D. McConnell
Texas Bar No. 24051020
Matthew S. Boyden
Texas Bar No. 24113620
Lawrence D. Finder
Texas Bar No. 07007200
5850 San Felipe, Suite 500
Houston, Texas 77057
Telephone: 713.224.5775
ryan@rmcconnellgroup.com

## **CERTIFICATE OF SERVICE**

On December 19, 2025, the foregoing was served on all counsel of record via the ECF filing system.

 /s/ *Catherine M. Maraist*