**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **V.** | § | **CRIMINAL ACTION NO.** |
| | § | **4:25-CR-00415** |
| **RAMON ALEXANDRO ROVIROSA** | § | |
| **MARTINEZ** | § | |

## DEFENDANT'S MOTION TO DISMISS CASE WITH PREJUDICE BASED ON THE COURT'S SUPERVISORY POWERS

Defendant Ramon Alexandro Rovirosa Martinez ("Mr. Rovirosa"), by and through undersigned counsel, hereby submits this *Motion to Dismiss Case With Prejudice Based On The Court's Supervisory Powers.* Specifically, Mr. Rovirosa moves this Court to use its supervisory powers to protect the integrity of the federal courts and prevent the Court from making itself an accomplice in the willful disobedience of the law. *See United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). This motion is based on the Government's misconduct in the prosecution and trial of Mr. Rovirosa.

Mr. Rovirosa submitted the issue of dismissal of the Indictment based on prosecutorial misconduct prior to trial in his first *Motion to Dismiss Indictment.* (Doc. No. 33). The court denied the motion without any discussion of the Government's misconduct in issuing a press release linking Mr. Rovirosa to Mexican cartel shortly after Mr. Rovirosa's arrest. Since the trial is now concluded, it is even clearer that the Government's conduct in using the press to portray Mr. Rovirosa as a cartel member prevented Mr. Rovirosa from having a fair trial. In

addition to this, the Government attorneys in this case (1) made misrepresentations to the Court and/or to the jury that willfully mispresented both the record and the legal standards; (2) failed to provide evidence to defense counsel, and (3) failed to present any witnesses at trial with actual knowledge of the facts. Even more alarming, the case was under the legal supervision of a Department of Justice supervisory attorney, who apparently allowed such conduct to occur.[1]

For the reasons set forth below, this Court should dismiss the case against Mr. Rovirosa with prejudice.

## **FACTUAL BACKGROUND**

*Arrest, a Detention "Motion," and the Government's Press Release*

Mr. Rovirosa was arrested on August 10, 2025. The initial appearance and detention hearing were sent for the next day. Several hours prior to the detention hearing, while the case was still under seal, the Government filed a "Motion to Impose Certain Conditions of Release" in the record. (Doc. No. 11).[2] Unlike a bona fide motion, this "motion" did not request any particular relief but instead "recommended" certain bond conditions, most of which had already been discussed with defense counsel as mutually acceptable.

---

[1] On the second day of trial, Suzanne Elmilady, a self-described supervisory lawyer, approached the bench during a sidebar with the Court. She indicated to the Court that she was there to provide legal advice to AUSA Brad Gray, who was one of the prosecutors in the case. The Court did not allow her to participate directly in the discussions. Trial Transcript, p. 440.

[2] There is no vehicle in the Federal Rules of Criminal Procedure for a "Motion to Impose Certain Conditions of Release." The usual vehicle getting relevant information regarding detention to the court is to bring them to the attention of the Pretrial Services Officer, who provides a report to the judge with information relevant to the detention decision. The report of the Pretrial Services Officer remains under seal because of its sensitive information. There was absolutely no reason for the Government to file a motion in this case, especially as it did not intend to argue for the detention of Mr. Rovirosa.

2

The Government's "motion" was full of false information, innuendo, and speculation. The Government told the Court that Mr. Rovirosa "lack[ed] significant community or family ties to the Southern District of Texas." This statement was false, and the Government knew it, as ICE agents had been to Mr. Rovirosa's house on more than one occasion and were well aware that he lived in The Woodlands with his wife and three children. In fact, the Government chose to arrest Mr. Rovirosa outside of his home in The Woodlands precisely because they knew he would be at his resident and not in Mexico. Furthermore, the Government was also well aware that Rovirosa owned Roma Energy Holdings, which was domiciled in the Southern District of Texas. Despite this, the Government went out of its way to portray Mr. Rovirosa as "a Mexican citizen with deep familial and business ties in Mexico," even though Mr. Rovirosa had lived and worked in the Houston area for decades.

The Government's efforts to portray Mr. Rovirosa as a shady foreign national did not stop there. The Government went on to add the following:

> Finally, while the offenses with which he has been charged are non-violent in nature, there is evidence that Rovirosa has ties to Mexican cartel members and that he was previously involved in violent conduct in Mexico. Multiple sources and media accounts have also alleged another individual with a close business relationship to Rovirosa is associated with Mexican cartels. Given these alleged links to Mexican cartels, Rovirosa presents a uniquely heightened risk of flight.

This accusation of "cartel links" was vague and tenuous at best, as it relied on unidentified "multiple sources and media accounts" to provide a link between Mr. Rovirosa and an unnamed individual who was "associated" with Mexican cartels. The accusation that Mr. Rovirosa was "involved in violent conduct" was similarly nebulous because the Government provided no explanation of its proof of such conduct and no indication as to whether Mr. Rovirosa was the

3

perpetrator or victim of such conduct. The reader was thus left to imagine the worst about Mr. Rovirosa.

The Government's misrepresentations would have been bad enough in and of themselves, but as long as the "motion" was kept under seal in the district court (as is the usual practice with sensitive information used at detention hearings), these representations might have been harmless. Instead, at the detention hearing, the Government moved to unseal the entire court record of the district court, including its "motion," thereby making this information available to the public. Shortly afterwards, the Government issued a press release in which it outlined the allegations of the indictment against Mr. Rovirosa. The Government stated in its press release that, "according to court documents, Rovirosa is alleged to have ties to Mexican cartel members."

The allegation of a link between Mr. Rovirosa and Mexican cartel members was picked up by the press and was widely covered nationally, locally and internationally, especially in Texas and Mexico. The articles referencing the supposed "cartel link" continue to live on the Internet.[3] The effect of the press release on this prosecution soon became clear: neither the Government nor Mr. Rovirosa could find any witnesses that would testify at trial. In fact, a prospective witness for PEMEX—the alleged victim—mentioned the August 11, 2025 press release in an interview with Government agents. The alleged link to the cartel was on the mind of PEMEX and ultimately no PEMEX witnesses testified at trial. All those alleged to have knowledge of the alleged bribes were Mexican citizens living in Mexico. The cartel allegation made it impossible for Mr. Rovirosa to find anyone who would agree to testify at trial based on their fear of cartel retribution.

---

[3] *See, e.g.,* Two Houston-area residents accused of bribing PEMEX officials for contracts | FOX 26 Houston; U.S. Officially Links Campeche Businessman Alexandro Rovirosa to Los Zetas Cartel; Mexicans Charged With Bribing US Refinery in Tighter Trump Focus; U.S. Files Bribery Charges Against Mexican National With Alleged Cartel Ties - Dow Jones. These websites were retrieved on December 29, 2025.

The Government's conduct in this matter was unconscionable. It used a motion it filed in court (which included both patently false information and tenuous and speculative accusations) to craft a press release to portray Mr. Rovirosa as a Mexican-based bad actor with "cartel links" solely to taint Mr. Rovirosa's image in the public. As the Government was doubtlessly aware, the "cartel" label is per se inflammatory and defamatory. The Government cannot "unring the bell," and the accusation will continue to reverberate for the rest of Mr. Rovirosa's life, affecting both him and his family. Such actions amounted to both prosecutorial misconduct and violations of Mr. Rovirosa's right to a fair trial.

*Pretrial Discovery Violations and Due Process Violations*

Prior to trial, defense counsel filed motions in limine to exclude certain Government evidence as well as a motion to compel the production of evidence under the Government's custody and control. The issues raised and the Government's responses, which contained numerous falsehoods, misrepresentations, and mischaracterizations, are outlined below.

- <u>Witness Testimony</u>.  The defense objected to the proposed testimony of Carlos Espinosa Barba to discuss PEMEX's policies and his money laundering conviction for participating in an unrelated bribery scheme, even though the witness had never been employed by PEMEX and he had no relevant information about the case. His testimony was both irrelevant and highly prejudicial. The defense also objected to the testimony of an alleged expert in Mexican law, David Lopez, whose proposed testimony was to describe PEMEX's structure and operations. Lopez, however, was not qualified as an expert, admitted that he reviewed no evidence beyond the indictment, and had no personal knowledge of any alleged transactions in the case. Even worse, the Government improperly sought to bolster Lopez's "expertise" by telling this Court that

5

Lopez was "a Mexican and U.S. trained lawyer…."Trained as a Mexican lawyer. Highly qualified Mexican lawyer."[4] Lopez was not, in fact, a Mexican-trained lawyer and he did not practice in Mexico.[5] Notably, the Government felt compelled to call these two witnesses, neither of whom had worked at PEMEX and/or had direct knowledge of the facts of the case, because PEMEX, the alleged victim, refused to produce any witnesses for the trial.

- <u>Brady Violations</u>. Defense counsel sought and obtained an order to produce all exculpatory evidence in the Government's possession. The Government failed to produce forensic copies of Mr. Rovirosa's cell phone, co-defendant Mario Avila's cell phone and iPad, as well as forensic copies of devices from other cooperators who had information relevant to Mr. Rovirosa's defense. The Government twice falsely represented to the Court that it had complied with all discovery and *Brady* obligations, even though it had only produced the text messages and other documents that it believed relevant, and not the complete forensic copies that it had in its possession. The first misrepresentation occurred on September 26, 2025 and October 1, 2025.[6] DOJ Attorney Bennett Starnes stated that the drive containing the forensic images (or copies) was at the U.S. Attorney's Office and that they could be accessed there; in a follow up email, Attorney Starnes states that the Filter Agent "would be dropping off the files soon and would be ready the same afternoon." The defense did not receive the forensic copies of the

---

[4] Transcript of September 29, 2025 Pretrial Conference, p. 20.

[5] Trial Transcript, pp. 642-642. Mr. Lopez did not obtain a law degree in Mexico or work in Mexico as a lawyer. He studied Mexican law when he was a teaching law in the United States.

[6] See Exhibit 1, Emails from DOJ Attorney Bennett Starnes to defense counsel regarding the Filter Team Production.

devices that day. The second occurred at the pretrial conference held on October 2, 2025. During that conference, counsel for the Government assured the Court that it had complied with its discovery and *Brady* obligations by stating: "So, we received all of the data that -- or all of the exhibits, excuse me, Your Honor, that are on the 100 series that were taken from Mr. Rovirosa's device, were taken from the phone….They have had that device, the actual device, back in hand since 2024. We've also provided an image -- the full image of that device...."[7] This was simply not true. No forensic copies of any of the devices were ever delivered to defense counsel. The only evidence that Mr. Rovirosa received from the Government were text messages that the Government chose to extract from the phones. Because the Government's entire case hinged on text messages as proof of the alleged conspiracy and substantive crimes, Mr. Rovirosa's due process rights were violated by not having the opportunity to inspect and challenge the totality of the Government's evidence.

- <u>Misstatements Regarding Mr. Rovirosa's Alleged "Confession."</u> The Government sought to use statements made during a secretly recorded interview between Mr. Rovirosa and ICE agents, which defense counsel objected to. The Government asserted to the Court at the Pretrial Conference held on September 29, 2025, that "Rovirosa even stated during an interview, 'I know my company pays bribes,'" when in fact, the Government knew that Mr. Rovirosa's statement related to uncharged conduct and uncharged entities, and that it was unclear what conduct Rovirosa was actually referring to in recorded interview. This error would later be repeated during the Government's opening argument.

---

[7] Transcript of October 2, 2025 Pretrial Hearing, p. 17.

- <u>Misstatements Regarding the Standard Necessary To Establish The Applicability of the Co-conspirator Exception to the Hearsay Rule And Misstatements Regarding the Nature of Mr. Rovirosa's WhatsApp Communications.</u> During the pretrial proceedings, the Government stated that for the co-conspirator exception to hearsay rule to apply, the "government simply must show by a preponderance of the evidence, one, that a conspiracy exists; two, that the statement was made by a co-conspirator; three, the statement was made within the course of a conspiracy, and, four, the statement was made in an effort to further the conspiracy."[8] However, the Government conveniently omitted any discussion of Fed.R.Evid. 801(d)(2)(E), which states that "[t]he statement [of a co-conspirator] must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E)." Further compounding the error was the Government's blatant mischaracterization of the text messages to the Court when it stated, "[a] number of these messages also involve Mr. Rovirosa directly engaged in referring to the splitting up of bribes to be paid to PEMEX officials." There are no communications to which Mr. Rovirosa was a party that mention bribes or PEMEX entities. There were no messages between Mr. Rovirosa and the co-defendant Mario Avila directly showing any agreement or any knowledge on Mr. Rovirosa's part of the activities that allegedly occurred in Mexico. In fact, the only evidence that the Government had of an alleged conspiracy was the electronic messages themselves, with no fact witness to testify as to the existence of any agreement to violate the law. In the

---

[8] Transcript of September 19, 2025 Pretrial Conference, pp. 25-26

end, the Government was allowed to put all of the messages into evidence without properly establishing the existence of a conspiracy. The admission of the emails under the co-conspirator exception to the hearsay rule based solely on the evidence of text messages themselves, violated Rule 801(d)(2)(E) and resulted in a "trial by paper," which defense counsel could not cross-examine.

*Foul Play at Trial*

Further compounding these errors was the Court's provisional admission of objected-to evidence prior to trial. The Government took advantage of the pretrial provisional admission of all its exhibits by assuming (rightly) that all of its exhibits would come in. Thus, the Government was able to present evidence without following the usual trial format of authenticating and introducing exhibits, which made it possible for it to ambush the defense team at trial.

The Government began the trial by misrepresenting Mr. Rovirosa's alleged admission of guilt in its opening statement by asserting that: "he [Mr. Rovirosa] even told law enforcement he knew it was wrong to pay bribes." (Tr. Transcript, p. 190)." This was simply false. Mr. Rovirosa never admitted to paying any bribes; he merely acknowledged that those working for Roma Energy Holdings (an uncharged entity) had probably paid brides in Mexico. Furthermore, the statement was made while Mr. Rovirosa and the ICE agent were discussing events and entities that were unrelated to the allegations of the Indictment. By completely skewering Mr. Rovirosa's actual statement, the Government presented a false account of an admission that did not occur.

The Government then sought to admit certain portions of the secretly recorded interview of Mr. Rovirosa in its case-in-chief, specifically, the statement where Mr. Rovirosa

9

admitted that some employees in Roma Energy Holdings had likely paid bribes in Mexico. Defense counsel objected on the basis that it was irrelevant to the charges of the Indictment and it contained the hearsay statements of a co-conspirator, the admission of which would violate *Bruton v. United States,* 391 U.S. 123 (1968). Ultimately, the  complete audio recording was played to the jury but was not admitted into evidence. The playing of the recording without admitting it into evidence likely confused the jury, who sent a note asking for a transcript of the recording. Most importantly, the playing of the recording with hearsay statements that were violative of *Bruton* (which the Government knew about, and the Government had ample time to redact) was a violation of Mr. Rovirosa's Sixth Amendment confrontation rights.

But the most grievous misconduct was the  Government's "trial by ambush." The Government presented the testimony of Government agents to describe their investigation and to authenticate certain evidence (e.g., the text messages). The Government also sought to present select text messages to the jury through the case agent, Isis Sanchez. The Government planned to have Ms. Sanchez present a Power Point summary exhibit to the jury with the text messages that the Government contended proved the conspiracy. This presentation, which would last for several hours, would involve Ms. Sanchez testifying as to the meaning of the text messages. After defense counsel objected, the Court disallowed the summary exhibit and testimony related thereto because Ms. Sanchez did not prepare the exhibit and could not lay the foundation for it.[9]

Apart from the Government agents, who had little to no direct knowledge of the facts alleged, the Government did not call any witnesses who had first-hand knowledge of the

---

[9] Trial Transcript, 433-440.

factual allegations of the Indictment. Aside from a handful of text messages and other nominal evidence that it discussed with the case agents during trial, the Government did not provide any evidence to the jury prior to the close of trial. Because the exhibits were "provisionally admitted" at the beginning of trial, the text messages that comprised the bulk of the Government's proof were dumped on the jury shortly before the closing statement. During its closing argument, the Government went through the Power Point presentation that had been previously excluded as evidence for the lack of a proper foundation, with the Government lawyer providing the missing testimony of fact witnesses. The Government essentially used its closing argument to testify as to the alleged facts of the case, which it is not allowed to do. Because the Government was discussing most of the text messages for the first time during closing argument, defense counsel's hands were completely tied, as they could not cross-examine the Government lawyer as to her "testimony" at closing argument. Mr. Rovirosa was robbed of the ability to test the evidence against him because there was no fact witness presented at trial.

The Government's conduct from the detention hearing through trial was reckless at best and intentional and malicious at worst. The legal remedies for the irreparable harm sustained are discussed below.

ARGUMENT

I.  <u>The Government's Indictment Should Be Dismissed Based On Prosecutorial Misconduct That Resulted In Uncurable Prejudice To Rovirosa's Ability To Defend Himself</u>.

The Supreme Court has recognized that the Due Process Clause imposes limits on the manner in which the Government may pursue criminal prosecutions. In *United States v. Russell*, 411 U.S. 423, 431-32 (1973), the Court explained that government conduct may be so

11

outrageous that it violates "fundamental fairness" and is "shocking to the universal sense of justice," such that due process principles bar the Government from invoking the judicial process to obtain a conviction. Although the standard is intentionally high, it is met where government actions undermine the integrity of the judicial process itself and deprive a defendant of a fair opportunity to defend against the charges.

Separately, the Supreme Court has made clear that federal courts possess supervisory authority to dismiss indictments where prosecutorial misconduct prejudices the defendant and threatens the legitimacy of the proceedings. In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988), the Court explained that dismissal is an appropriate exercise of supervisory power where misconduct substantially influences the charging decision or creates grave doubt that the proceedings were free from such influence. That authority exists not only to remedy constitutional violations in individual cases, but to preserve the integrity of the judicial process and deter prosecutorial conduct that threatens the fairness and legitimacy of criminal proceedings. *United States v. Hasting*, 461 U.S. 499, 505 (1983).

The Fifth Circuit has adopted this prejudice-based framework. In *United States v. Swenson*, the court held that whether acting under supervisory authority or constitutional duty, dismissal for prosecutorial misconduct is warranted where the defendant has been unfairly prejudiced. 894 F.3d 677, 684-85 (5th Cir. 2018) (citing *United States v. McKenzie*, 678 F.2d 629, 631).

Other federal courts have further illuminated the scope of misconduct warranting dismissal, particularly where the Government's actions reflect a pattern of reckless disregard for fairness rather than an isolated error. Particularly instructive is the Ninth Circuit Court of Appeals' decision in *United States v. Bundy,* 968 F.3d 1019 (9th Cir. 2020). In *Bundy*, the

12

defendant Bundy and his two sons, along with sixteen others, were charged with obstructing federal law enforcement officials carrying out lawful court orders, in connection with a well-publicized effort by the Bureau of Land Management to impound Bundy's cattle for a twenty-year failure to pay federal grazing fees. A central pillar of the Government's case against Bundy and his sons was that the defendants recruited armed followers by intentionally deceiving those following into believing that the Bundys feared for their lives because Government snipers had surrounded the Bundy's ranch. *Id.*, at 1024-1025.

In its preparation for trial, the defendants requested any potentially exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), including evidence that could negate the Government's scienter theory. *Id.*, at 1025. The Government sought and obtained a favorable ruling which limited the defendants' ability to introduce evidence regarding the affirmative defense of self-defense. *Id*, at 1025

During its opening statement, the Government stated that the Bundys were putting out messages on social media regarding the Bureau of Land Management which stated that:

> "BLM [was] a large Army that was coming to attack them, was coming to interfere with them was coming to abuse them. And you will hear how the messaging transformed rom stealing cattle to now they've got snipers aimed at us. Now we can't move. We've got to shelter in place. We can't do anything because the BLM has got us surrounded. And that was false...." *Bundy,* at 1025-26.

On the fourth day of trial, the Bundys discovered that there had been a camera set up on the hill near the Bundy home. The evidence from this camera showed the presence of heavily armed patrols near the Bundy property, which undercut the Government's ability to prove that the Bundys had lied to their supporters. The trial court held that the Government had not acted in bad faith. However, when the Government disclosed two investigative reports

(FBI 302s) which described an FBI agent dressed in tactical gear and an FBI log which referenced the insertions of "snipers" and recounted descriptions of the live feed from their surveillance camera. The defense again moved to dismiss the case, which the district court again denied. As other potentially exculpatory evidence continued to trickle in, the court concluded that the trial could not proceed. Ultimately, the district court found that the *Brady* violations were so egregious and prejudicial that a retrial would only allow advantage by allowing it to strengthen its witnesses' testimony based on the knowledge gained from information provided.

The Ninth Circuit affirmed the district court's dismissal with prejudice. In so doing, the court held that "a district court may dismiss an indictment under its inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and (3) to deter future illegal conduct." *Id.,* at 102. Notably, [a] district court dismiss an indictment even if the conduct does not rise to the level of a due process violation." *Id.,* at 1030 (internal cites omitted). Under its supervisory powers, the district court may limit the witness testimony or evidence offered by the Government; it can sanction the attorneys; or dismiss the case with or without prejudice. *Id.*, at 1031. Under its supervisory powers, a district court may dismiss an indictment with prejudice for prosecutorial misconduct only if there is (1) flagrant misbehavior and (2) substantial prejudice." *Id.* For conduct to be considered "flagrant" for the purposes of a dismissal with prejudice, the conduct need not be intentional or malicious; rather "reckless disregard for the prosecution's constitutional obligations is sufficient to give rise to flagrant misconduct." *Id.,* at 1038.

14

The reasoning in *Bundy* applies with equal force here. The Government's misconduct was not confined to a failure to disclose evidence or a single litigation misstep. Instead, the Government knowingly filed a motion containing misrepresentations and inflammatory speculation, moved to unseal that filing, and then amplified those allegations through a public press release falsely asserting that "court documents" showed Mr. Rovirosa had cartel ties. The foreseeable and actual consequence of that conduct was the destruction of Mr. Rovirosa's ability to secure witnesses, the elimination of live testimony subject to cross-examination, and the collapse of any meaningful defense. This was not incidental or harmless misconduct; it was deliberate, strategic, and devastating.

That harm was compounded by the Government's litigation tactics at trial. Having destroyed the availability of fact witnesses, the Government relied almost exclusively on text messages, withholding their presentation until closing argument. The adversarial process was reduced to an untested presentation of evidence immune from meaningful challenge. Further, the Government's misrepresentation in opening statement—that Mr. Rovirosa admitted to paying bribes—underscores why supervisory intervention is required. That statement was false, and the Government knew it. False representations to the jury, particularly when combined with misconduct that deprived the defense of witness confrontation, threaten not only the defendant's rights but the integrity of the court itself. Allowing such conduct to go unchecked would signal that prosecutors may manufacture prejudice, distort the evidentiary record, and mislead the jury without institutional consequence.

Even absent a finding of a constitutional violation, the Court's supervisory authority exists precisely to address this type of systemic breakdown. The harm caused by the Government's misconduct cannot be undone. The bell cannot be unrung, and Mr. Rovirosa has already suffered

irreparable prejudice. As explained in greater detail below, dismissal is therefore the only remedy sufficient to protect the judicial process.

    A.  The "Cartel Motion" and Subsequent Press Release.

In this case, the Government filed a motion with the district court on the same day as the detention hearing of Mr. Rovirosa. The "motion" did not ask for any particular relief, although it laid out some proposed conditions, which could easily have been communicated to the Pretrial Services Officer who prepared the Bond Report for the Court or simply to the Magistrate Judge at the hearing itself. Instead, the Government used its "motion" to do two things: (1) to falsely portray Mr. Rovirosa as having few familial or business ties with the Southern District of Texas, and (2) to create an "affiliation" in the record between Mr. Rovirosa and a Mexican cartel. At the end of the detention hearing the Government moved to unseal the record, which included the "motion," putting its misrepresentations regarding Mr. Rovirosa's ties to his family and his alleged affiliation with a cartel in the public domain.

Worse still, in a press release issued the same day, the Government announced the Indictment against Mr. Rovirosa and went on to state that "court records [not specifically the previously referred-to Indictment] showed that Mr. Rovirosa and Mario Alberto Avila Lizarraga had conspired together to bribe PEMEX, the Mexican state-own oil company." The Government also included in it release this cagily worded and disingenuous statement: "In addition, according to court documents, Rovirosa is alleged to have ties to Mexican cartel members."

There are only two reasonable ways to interpret this last statement: (1) the Government had actually alleged that Mr. Rovirosa was part of a cartel in its Indictment, or  (2) there were "court documents" involving another legal matter alleging that Mr. Rovirosa part of a cartel.

16

The former is the more plausible interpretation since the press release refers to the allegations of the Indictment as being in "the court documents." By failing to specify which part of the "allegations" were part of the Indictment and which were not, the Government created the unmistakable impression that allegations involving cartel involvement had been formally brought against Mr. Rovirosa in this case. That impression would, in turn, lead a reasonable reader to believe that the Government had credible and admissible evidence of cartel membership that could help explain Mr. Rovirosa's motive and *mens rea* and thus help convict Mr. Rovirosa of the charged conduct. The Government did not have such evidence.

Indeed, the whole of the Government's August 11, 2025 press release shows the disingenuousness of the Government's prosecution of the case. For example, the Government stated that: "This indictment should send a clear message that the Criminal Division will not tolerate those who enrich corrupt officials for personal gain and to the detriment of the fair market." But this is not accurate, as the Government has indicated that it will tolerate conduct that would be actionable under the FCPA if it allows American companies to compete on equal footing as others in foreign countries. In a February 5, 2025 memo, entitled "Total Elimination of Cartels and Transactional Crime Organizations," Attorney General Pam Bondi, following President Trump's directives,  outlined the new DOJ policy regarding FPCA prosecutions:

> Foreign Corrupt Practices Act. The Criminal Division's Foreign Corrupt Practices Act Unit shall prioritize investigations related to foreign bribery that facilitates the criminal operations of Cartels and TCOs [Transnational Criminal Organizations], and shift focus away from investigations and cases that do not involve such a connection. Examples of such cases include bribery of foreign officials to facilitate human smuggling and the trafficking of narcotics and firearms.[10]

---

[10] The Memorandum is attached hereto as Exhibit 2. Shortly thereafter, President Trump issued an executive order regarding FCPA enforcement. *See* Pausing Foreign Corrupt Practices Act Enforcement to Further American Economic and National Security – The White House. In this order, President Trump eased enforcement of the FPCA to ensure American competitiveness abroad. ("[O]verexpansive and

The Government's shift in prosecuting FCPA cases is clear from this Memo: the Government would bring cases under the FCPA only for cases involving TCOs or cartels, most usually for cases involving human and narcotics trafficking. In this case, the Government could not even link Mr. Rovirosa to any of the entities alleged in the Indictment, much less a TCO or a cartel. Aware that the prosecution of Mr. Rovirosa did not fit under the new DOJ criteria, the Government filed a motion alleging a "link" to a cartel solely to provide a justification for a prosecution that the DOJ would otherwise avoid.

As stated in *Bundy*, it matters not whether the Government's conduct was intentional or malicious; it must simply be done with reckless disregard for the defendant's due process rights. In this case, the Government was not merely reckless, but intentional and malicious. As a result of this prosecutorial misconduct, the Government hindered Mr. Rovirosa's ability to call and cross-examine witnesses on his behalf, in violation of his due process rights.

The Government's prior attempt to defend this conduct in its *Opposition* (Doc. No. 42) to Mr. Rovirosa's *Motion to Strike* (Doc. No. 29) is as disingenuous as its press release. In its Opposition, the Government stated that "in other DOJ press releases, the DOJ has highlighted defendants' affiliations, including those whose connections were unrelated to the charged conduct." In support, the Government cited the following press releases: (1) Middle District of Florida | Twelve Lakeland-Based Gang Members Charged With Paycheck Protection

---

unpredictable FCPA enforcement against American citizens and businesses — by our own Government — for routine business practices in other nations not only wastes limited prosecutorial resources that could be dedicated to preserving American freedoms, but actively harms American economic competitiveness and, therefore, national security. It is therefore the policy of my Administration to preserve the Presidential authority to conduct foreign affairs and advance American economic and national security by eliminating excessive barriers to American commerce abroad.")

Program Fraud | United States Department of Justice; (2) Office of Public Affairs | Texas Man Sentenced to 11 Years in Prison and Ordered to Pay $2M Fine for Conspiring to Monopolize International Transit Industry, Fix Prices, Extort $9.5M, and Launder Money | United States Department of Justice; (3) Office of Public Affairs | Guatemalan Man Unlawfully Residing in the United States and Convicted of Sexual Battery Indicted for Fraudulently Obtaining Custody of an Unaccompanied Alien Child in the United States | United States Department of Justice; and (4) Eastern District of New York | Alleged Mafia Soldier Charged With Tax Evasion | United States Department of Justice.

These cases are, for the most part, inapposite. The "Lakeland-Based Gang Member" press release reflects allegations in the indictment that the defendants were members of a particular gang. Thus, the press release accurately reflected the allegations in the Indictment. The "Texas Man Sentenced to 11 Years" references a press release that occurred after the defendant was convicted and sentence, not as a reference to charged conduct. The "Guatemalan Man Unlawfully Residing in the United States" referred to conduct for which the defendant had previously been convicted, a factual assertion that was already a matter of public record. The "Alleged Mafia Soldier Charged With Tax Evasion" press release does mention an uncharged allegation of the defendant being a "Mafia Soldier"; however, such an allegation was unlikely to deter Government or defense witnesses based on the alleged crime, i.e., tax evasion, most of whom would likely be local and easily subpoenaed. Even so, the Government's argument that "we've done this sort of thing before" regarding unalleged conduct in press releases does not make it right or less violative of a defendant's right to a fair trial.

19

In short, the Government's rash, disingenuous, and reckless attempt to build its case in the press by releasing "allegations" of Mr. Rovirosa's cartel affiliation caused uncurable prejudice to Mr. Rovirosa. Simply put, there is no way to "unring the bell" in this case, and no potential foreign witness will ever want to be involved in a legal criminal trial of a person who has been accused of being a member of a cartel.

B. The Failure to Produce a Complete Forensic Copy of the Phones that Contained Electronic Communications for Defense Counsel's Review.

As set forth above, the Government repeatedly assured defense counsel and this Court that it would produce forensic copies of the electronic devices that contained the text messages that the Government relied on. The Government went so far as to represent to the Court that it had done so, when in fact it had not. At trial, one of the Government case agents acknowledged that he had copies that he could have provided to the defense.

Defense counsel was entitled to have the forensic copies of these devices. The Government was able to retrieve messages using a computer algorithm. There is no guarantee that all relevant messages were captured during the forensic copying process. Mr. Rovirosa was entitled to inspect the contents to ascertain that all relevant messages had been provided.

C. The Government's False and Misleading Statements To The Court And During Opening Statements.

As set forth *supra,* the Government, when discussing the admissibility of evidence during a pretrial conference, stated that "Rovirosa even stated during an interview, 'I know my company pays bribes." The Government's statement was misleading at best because it knew that the statement pertained to uncharged conduct and uncharged entities. Defense counsel objected to the characterization of Mr. Rovirosa's statement at that time as it was irrelevant to the conduct charged. However, at trial, the same Government lawyer told the jury in opening statement that

20

"he [Mr. Rovirosa] even told law enforcement he knew it was wrong to pay bribes."[11] This, again, was simply not what Mr. Rovirosa stated at all. The Government's attempt to find some sort of confession where there was none—and certainly no confession as to conduct or the entities that were charged in the indictment—was improper and the Government knew it. The Government's conduct showed that it knew that its case was weak without any direct testimony and it would have to resort to distortion to persuade the jury.

D. The Government's Misrepresentation Regarding The Standard For Establishing A Conspiracy.

Prior to trial, defense counsel sought to exclude the text messages between the alleged co-conspirators in this case. Counsel for the Government stated that it had met all the requirements for the co-conspirator exception to hearsay rule to apply, the "government simply must show by a preponderance of the evidence, one, that a conspiracy exists; two, that the statement was made by a co-conspirator; three, the statement was made within the course of a conspiracy, and, four, the statement was made in an effort to further the conspiracy." However, the Government omitted any discussion of Fed.R.Evid. 801(d)(2)(E), which states that "[t]he statement [of a co-conspirator] must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E)."

To support its argument that the text messages were in and of themselves sufficient to sustain a prima facia of a conspiracy for purposes of the co-conspirator exception to the hearsay rule (as well as Mr. Rovirosa's guilt on three of the four counts of the Indictment), the Government relies on the Fifth Circuit's decision in *United States v. Ayelotan,* 917 F.3d 394

---

[11] *See* Trial Transcript, p. 190.

21

(5th Cir. 2019). However, nothing in *Ayelotan* supports a finding that electronic communications, without corroborating evidence, are sufficient to find a conspiracy. There is no discussion in *Ayelotan* regarding the totality of the evidence presented at trial and/or what other proof the Government presented at trial to establish the conspiracy. The opinion is thus of no relevance to this case. Again, the Government's attempt to find authority where there clearly is none is yet another sign of its attempt to bolster a case for which it had almost no admissible evidence.

    E.  The Government's Failure to Present Any Non-Government Fact Witnesses at Trial.

As stated above, the Government presented its case without any witnesses who had actual knowledge of the events alleged in the Indictment. In addition to case agents, the Government presented the testimony of two witnesses whose testimony was irrelevant to the case: (1) Carlos Espinosa Barba, a felon with no direct knowledge of the ethical standards of PEMEX, which he was asked to testify about, and (2) Davis Lopez, a purported "expert in Mexican law" to describe the organization and inner workings of PEMEX. Neither witness met the standard for admissible testimony as neither had direct knowledge of the subject to which they were testifying. The Government's use of Mr. Barba as a witness was particularly troubling, as he had been convicted of unrelated conduct in another district, had no actual knowledge of the allegations against Mr. Rovirosa, and had never worked at PEMEX. The testimony of a convicted felon regarding violations of ethical codes (while clad in prison attire) was nothing more than a disturbing attempt by the Government to link Mr. Barba and Mr. Rovirosa to show "guilt by association."

F. The Government's Presentation Of Its Case-in-Chief During Closing Argument.

As set forth above, most of the Government's evidence was not presented to the jury during the trial itself. Rather, this evidence was first introduced to the jury in a "data dump" shortly before closing. During the Government's closing argument, the Government attorney essentially "cured" the Government's lack of witness problem by telling the jury who the parties to the text messages were and what the text messages meant. Notably, the Government used the same Power Point summary presentation that had excluded based on lack of foundation as a demonstrative exhibit for the closing. Defense counsel had no opportunity at any time during trial to challenge the Government's explanation of meaning of the text messages because the Government did not call anyone who was a party to the text messages. Defense counsel obviously could not cross-examine the Government attorney on her statements on closing, nor could counsel rebut the Government's testimony because, again, counsel's argument to the jury was not evidence that could be rebutted. The result was that almost all of the probative evidence came through electronic communications that were never corroborated by anyone allegedly involved in the alleged conspiracy and that could not be tested by defense counsel at trial. The Government's "trial by paper" deprived Mr. Rovirosa of his right to challenge the evidence against him in any meaningful way and thus he was deprived of a fair trial.

## CONCLUSION

The Government intentionally launched an inflammatory and defamatory statement regarding Mr. Rovirosa that directly impacted his ability to call and cross-examine witnesses in this case. Because the cartel statement is in the public domain, it would be highly unlikely, if not impossible, for Mr. Rovirosa to have anything other than the "trial by paper" that the Government

23

presented to this Court. In short, any future trial would be just a repetition of this one. The Government's flagrant misconduct and the uncurable harm it has caused to Mr. Rovirosa merits a full dismissal of this case with prejudice.

Accordingly, this Court should find that the Government's intentional, malicious, and/or reckless conduct has caused uncurable prejudice to Mr. Rovirosa and should exercise its supervisory powers to protect the integrity of the federal courts by dismissing the case against him with prejudice.

Respectfully submitted,

BREAZEALE, SACHSE & WILSON

By: */s/ Catherine M. Maraist*
Pro Hac Vice
Louisiana Bar No. 25781
300 Main Street, Ste. 2300
Baton Rouge, LA  70801
Telephone: 225.381.3168
catherine.maraist@bswllp.com


R. MCCONNELL GROUP
By: */s/ Ryan D. McConnell*
Ryan D. McConnell
Texas Bar No. 24051020
Matthew S. Boyden
Texas Bar No. 24113620
Lawrence D. Finder
Texas Bar No. 07007200
5850 San Felipe, Suite 500
Houston, Texas 77057
Telephone: 713.224.5775
ryan@rmcconnellgroup.com

## CERTIFICATE OF SERVICE

On January 2, 2026, the foregoing was served on all counsel of record via the ECF filing system.

/s/ *Catherine M. Maraist*