IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. |
| | § | 4:25-CR-00415 |
| RAMON ALEXANDRO ROVIROSA | § | |
| MARTINEZ | § | |

## DEFENDANT'S RESPONSE TO COURT QUESTIONS

The government tried this case almost entirely through flawed English translations of Spanish-language messages. Under *Crawford*, those translations were testimonial from the moment they were prepared for prosecution—and the translators were required to appear for cross-examination. The government noticed one surrogate translator witness, Maria Vega, who certified translations she did not perform, and then never called her, nor any of the at least 15 different translators. That violated the Confrontation Clause.

The defense challenged the translations at every stage of the proceedings and included expert analysis that showed a patchworking of guessing and speculation—over fifteen different people trying to tell a government story. Wrong words. Missing text. Slang butchered. Meaning invented that was never there. Even pre-*Crawford* case law mandated a witness. The government's response has always been burden shifting and reliance on legally deficient certifications. But "[t]he Confrontation Clause imposes a burden on the prosecution to present . . . witnesses, not on the defendant . . . ." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).

## **TABLE OF CONTENTS**

DEFENDANT'S RESPONSE TO COURT QUESTIONS ............................................................. 1

TABLE OF CONTENTS ............................................................................................................... 2

TABLE OF AUTHORITIES ......................................................................................................... 3

EXHIBITS ..................................................................................................................................... 4

BACKGROUND ON QUESTIONS PRESENTED ....................................................................... 5

QUESTIONS RAISED BY THE COURT ..................................................................................... 9

    1. When, if ever, do WhatsApp and email transmissions become testimonial, as opposed to instances of translations of a foreign language conversation? ..................................................... 9

    2. When, if ever, do government translations of written foreign communications become admissible and under what federal rules of evidence? The Court seeks case precedent over arguments. ..................................................................................................................................... 25

    3. Who translated the WhatsApp and email transmissions from the defendant's device? Are there certifications to support translations? What rules support admission? ............................... 26

CONCLUSION ............................................................................................................................. 29

CERTIFICATE OF SERVICE ..................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011)....................................................... passim
*Crawford v. Washington*, 541 U.S. 36 (2004) ...................................................... passim
*Davis v. Washington*, 547 U.S. 813 (2006)..................................................................14
*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ...........................................................29
*Hemphill v. New York*, 595 U.S. 140 (2022) ...............................................................15
*Illunga v. Holder*, 777 F.3d 199 (4th Cir. 2015)..........................................................24
*Jack v. Trans World Airlines, Inc.*, 854 F. Supp. 654 (N.D. Cal. 1994)......................27
*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ........................................1, 14, 22, 24
*Ohio v. Roberts*, 448 U.S. 56 (1980)...........................................................................16
*Perez-Lastor v. INS*, 208 F.3d 773 (9th Cir. 2000)......................................................25
*Smith v. Arizona*, 602 U.S. 779 (2024) ......................................................................20
*State v. Lopez-Ramos*, 929 N.W.2d 414 (Neb. 2019) .............................................16, 19
*Taylor v. State*, No. 2686, Sept. Term 2013 (Md. Ct. Spec. App. 2016)....................15, 16, 17, 19
*Towne v. Eisner*, 245 U.S. 418 (1918).........................................................................14
*United States v. Armendariz-Mata*, 949 F.2d 151 (5th Cir. 1991)...............................23
*United States v. Ayelotan*, 917 F.3d 394 (5th Cir. 2019) ............................................23
*United States v. Budha*, 495 F.App'x 452 (5th Cir. 2012)...........................................19
*United States v. Charles*, 722 F.3d 1319 (11th Cir. 2013).................................... passim
*United States v. Cordero*, 18 F.3d 1248 (5th Cir. 1994)....................................10, 18, 27
*United States v. Curbelo*, 726 F.3d 1260 (11th Cir. 2013) ......................................12, 20
*United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018) .............................................7, 21
*United States v. Kolodesh*, 415 F. Supp. 3d 613 (E.D. Pa. 2019).................................16
*United States v. Llinas*, 603 F.2d 506 (5th Cir. 1979) .............................................23, 24
*United States v. Martinez-Gaytan*, 213 F.3d 890 (5th Cir. 2000)...............................21, 25
*United States v. Monjaraz*, No. 5:22-CR-00002, 2022 WL 17182069 (W.D. Va. Nov. 23, 2022) .............................................................................................................12
*United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991) ...............................10, 16, 17
*United States v. Onori*, 535 F.2d 938 (5th Cir. 1976).................................................23
*United States v. Orm Hieng*, 679 F.3d 1131 (9th Cir. 2012) ............................10, 18, 19
*United States v. Romo-Chavez*, 681 F.3d 955 (9th Cir. 2012)..................................12, 20
*United States v. Richard*, 678 Fed.Appx. 927 (11th Cir. 2017).....................................20
*United States v. Stone*, 960 F.2d 426 (5th Cir. 1992) .................................................23
*United States v. Soriano*, 2021 WL 2744644 (9th Cir. 2024)......................................17
*United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981)........................................26
*United States v. Ye*, 808 F.3d 395 (9th Cir. 2015) ......................................................18

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V....................................................................................................5, 23
U.S. Const. amend. VI (Confrontation Clause) ................................................... passim

**STATUTES**

28 U.S.C. § 1746...........................................................................................................26

## RULES

Fed. R. Evid. 604 .................................................................................................................. passim
Fed. R. Evid. 702 ...................................................................................................................26, 28
Fed. R. Evid. 801(d)(2)(E)...........................................................................................................21
Fed. R. Evid. 901(b)(6) ................................................................................................................26
Tex. R. Evid. 1009 .......................................................................................................................29

# EXHIBITS

EXHIBIT 1—Report of Review of Government Translations .................................................5, 24

EXHIBIT 2—October 5, 2025 Letter from Government Attorneys to Judge Hoyt .......................6

EXHIBIT 3—October 16, 2025 Letter from Government Attorneys to Defense Counsel .......6, 22

EXHIBIT 4—November 19, 2025 Email from Ryan McConnell to Government Attorneys .........8

EXHIBIT 5—Certificates of Translations Provided by Government............................6, 22, 27, 28

## BACKGROUND ON QUESTIONS PRESENTED

From the start, Mr. Rovirosa raised the same Sixth Amendment concern: the government never called a single translator to testify. Not one. That violated the Confrontation Clause—on top of separate Fifth Amendment violations (*e.g.*, *Brady*, the due process, etc.). The entire case rested on translations the defense proved were wrong. *See* Exhibit 1 (Motion to Dismiss III, ECF 60, Ex. 1.). The defense hired experts. Identified specific errors. Put the evidence before this Court. The government's response was paper—certifications from a surrogate witness who did not do the work, none of which met basic legal requirements. But no amount of paper could fix the Confrontation Clause problem. The fix was simple: call the translators. The government refused. And the convictions cannot stand.

October 6 Hearing.

The first full briefing of this issue came in Mr. Rovirosa's Motion to Dismiss III, filed on October 6, 2025. Mr. Rovirosa outlined the problems with the translations with supporting documentation from a certified interpreter and a translation company. *See* Exhibit 1.

Later that morning, at the October 6, 2025, hearing, Mr. Rovirosa laid his concerns out to the Court, outlining how Judge Barkett's application of *Crawford* to translations in *United States v. Charles*, 722 F.3d 1319, 1324–30 (11th Cir. 2013), barred the government's effort to rely on certifications for flawed transcripts without live witnesses. Consistent with *Crawford*, the defense argued, "if they want to use those transactions, they need to bring the translator here and the jury needs to know that this isn't a literal

documented translation of what actually occurred. This is just what this person thinks." *See* Oct. 6 Hr'g Tr. at 24–26.

But the day before, on October 5, the government tried a different approach. It sent the Court a letter that buried the Confrontation Clause issue entirely—reframing the problem as one of "competing translations." *See* Exhibit 2 (Gov't Letter re Translations). The government said, "the defendant bears the burden to present an alternative translation" and that if the defendant does not, "a district court is under no obligation to rule on the accuracy of the translation submitted by the government."

Three days later, on October 8, the government filed its response to Mr. Rovirosa's Motion to Dismiss III—twenty pages that confused the original Spanish messages with the English translations, misread *Charles*, inverted the Confrontation Clause burden, and argued, remarkably, that because the messages were texts rather than live interviews, the translators who rewrote them for trial posed no constitutional problem at all. *See* ECF 64.

<u>Maria Vega Disclosed As A Witness.</u>

On October 16, 2025, the government disclosed one translator as a potential witness: Maria Vega. She *retroactively* signed a blanket certification covering all of the government's exhibits—over 100 items—even though fifteen other people had done most of the translating months earlier. *See* Exhibit 3 (email and letter noticing translator witness), and Exhibit 5. The threadbare certifications the government provided as part of discovery showed that, at best, Maria Vega translated some of Mr. Rovirosa phone records; none of Avila's records and that other people performed most of the translations.

Maria Vega's certification was never clear on what she did, when, and why—answers that would only surface in cross-examination. As discussed below, even ignoring the Confrontation Clause issue and Fifth Circuit law requiring her testimony, her certification was legally deficient and only put together as an afterthought to support the government's misdirection with the Court on the Sixth Amendment issue.

October 21 Orders

On October 21, 2025, relying on the government's representations in its letter and brief, the Court denied Mr. Rovirosa's motion. It ruled that the "government's translations 'supported by a certification that they are true and correct translations, pursuant to FED. R. EVID. 604' are admitted." The Court adopted the government's view that the defendant could submit a competing translation, but did not address the Confrontation Clause issue, Mr. Rovirosa's core concern. *See* ECF 74. The Court had not seen a single government certification when it made this ruling. It relied entirely on the government's word.

On the same day, in a separate order, the Court denied Mr. Rovirosa's Motion to Dismiss III. The Court distinguished *Charles* on the ground that "[t]hat state of affairs is not where Rovirosa finds himself" because "[t]he email exchanges, at least in part, are those between Rovirosa and Avila" and "[t]herefore, they are not testimonial statements." The Court also cited *Gurrola*, 898 F.3d 524, 535 (5th Cir. 2018), for the proposition that co-conspirator discussions outside Mr. Rovirosa's presence do not become "testimonial." ECF 75 at 8. But that was not the issue. The defense never argued the original Spanish messages were testimonial. The Confrontation Clause problem is the English

translations—a separate question the Court did not reach. Following these rulings, the government quietly abandoned its plan to call Maria Vega.

Continued Objections to Translations

Mr. Rovirosa kept objecting. He focused on handwritten notes the translators inserted throughout the translations—bracketed guesses at meaning for use at trial. On November 11, 2025, the defense objected to translator "TN" notations where translators had speculated as to the meaning of concepts and inserted bracketed commentary. The government agreed to remove these notations. *See* Exhibit 4 (Nov. 11 and 19, 2025 emails).

On November 19, 2025, the defense wrote to the government: "We do not waive our prior Confrontation Clause argument or otherwise agree these are admissible. As noted below, we will provide our substantive objections by next Friday (the 28th)." *See* Exhibit 4 (Nov. 19, 2025 email). That same email also identified misleading government exhibits showing English text on screenshots of Mr. Rovirosa's phone—creating the false impression that Mr. Rovirosa communicated in English when the original messages were in Spanish. With all of its translations admitted, the government refused to remove these images. *See id.* Mr. Rovirosa proceeded to trial resting on his preserved objections.

Constitutional Harm In Trial

The trial proved why this matters. The importance of the translations and the *Crawford* issue was made clear by the government's own witnesses. The lead case agent, SA Matthew Wood, does not speak or read Spanish. He told the jury he relied "on other people and translation services" to understand the evidence. Day 2 Trial Tr. at 274. The

government's Mexican law expert, David Lopez—who is not a Mexican lawyer—testified about the importance of context and culture in understanding Mexico. Day 3 Trial Tr. at 676–78. The government even brought a stand-by translator for convicted criminal Carlos Barba, an English speaker who was there only to harm Rovirosa's character. The government had a translator ready for a witness who did not need one—but refused to call a single translator for the evidence that did. Day 3 Trial Tr. at 680.

The defense raised the translation errors in opening, the Rule 29 hearing, and closing. And the jury noticed. During deliberations, the jury sent a note asking for the original Spanish messages. That note tells this Court everything it needs to know: twelve citizens tried to look past the English translations and could not. In response, DOJ lawyer Lindsay Carson told the Court—falsely—that the defense had "agreed" to the translations and urged the Court to tell the jury none were objected to. The defense corrected the record: "they were all objected to, our objections were just overruled." The Court acknowledged there was no agreement. Day 4 Trial Tr. at 952–58. The jury was never provided the Spanish originals.

**QUESTIONS RAISED BY THE COURT**

After the trial, in his JNOV and Motion to Dismiss IV, Mr. Rovirosa re-raised the translation issue, in addition to numerous other constitutional violations. In response, the Court has now raised three questions.

**1. When, if ever, do WhatsApp and email transmissions become testimonial, as opposed to instances of translations of a foreign language conversation?**

They become testimonial when a translator sits down, reads someone else's words, and decides what they meant for use at trial. The translator does not hear tone. Does not know the speakers. Does not understand the culture, the slang, the shorthand between friends. The translator guesses—and in guessing, becomes a witness, inserting new meaning into the story the jury will hear. When that translator is paid by the government and the defense cannot question the choices made with cross-examination, the translation is a testimonial act, violating the Confrontation Clause. That is what happened here.

### Interpreter vs. Translator

The case law draws a critical line between two very different things: interpreters and translators. A live interpreter stands between two people who are talking. They are present in the room. If she gets a word wrong, the speaker corrects her. The other side objects in real time. They are not looking at pieces of five-year-old records, with no context or input from the speaker. That is why courts have sometimes treated live interpreters as "language conduits"—everyone is in the room, and mistakes get caught immediately. Nearly every case applying the "language conduit" theory involves exactly that: a live interpreter at an interrogation or a drug deal, translating between people who are present. *See, e.g.*, *United States v. Nazemian*, 948 F.2d 522, 525-28 (9th Cir. 1991) (pre-*Crawford*; decided thirteen years before *Crawford* rewrote Confrontation Clause law); *United States v. Cordero*, 18 F.3d 1248, 1252–53 (5th Cir. 1994) (pre-*Crawford* adopting language conduit framework for live interpreter at drug transaction); *United States v. Orm Hieng*, 679 F.3d 1131, 1135-41 (9th Cir. 2012) (live interpreter at custodial interview). Even there, the Ninth Circuit acknowledged the problem. In *Orm Hieng*, the

panel noted the "tension between the *Nazemian* analysis and the Supreme Court's recent approach to the Confrontation Clause," and Judge Berzon concurred separately to call for *en banc* reconsideration of the conduit theory altogether. 679 F.3d at 1145, 1149 (Berzon, J., concurring). The courts apply this theory knowing it is dying. And translation of written communications is a different thing entirely.

A translator working from a piece of paper has no engagement with the speaker. There is no back-and-forth. No one is in the room to say "that is not what I meant." The translator reads words on a page and decides—alone—what they mean. When the words are informal—slang, shorthand, inside jokes between friends—the translator is not conveying meaning but creating it. The government's own translators admitted as much: they inserted bracketed "TN" notes throughout the translations where they could not be sure what the speakers meant. A conduit does not guess. A conduit does not make choices. But that is all a translator does. Every sentence requires decisions about tone, register, and which of several possible English words best captures a Spanish phrase that has no direct equivalent. There is no one-to-one correspondence between languages. Professional translators know this. They do not parrot words; they "render meaning by reproducing the full content of ideas" from one language into another. That is not a mechanical act. It is an intellectual one—requiring judgment that different translators will exercise differently. The "conduit" metaphor is a legal fiction.

These translators guessed constantly—across thousands of messages, without speaking to any of the participants. That is not a conduit. That is a witness. Even in cases finding no Confrontation Clause problem with translated communications, a live witness

independently confirmed accuracy. *See* <u>United States v. Monjaraz</u>, No. 5:22-CR-00002, 2022 WL 17182069, at \*10 (W.D. Va. Nov. 23, 2022) (holding that where particular facts cast significant doubt upon accuracy, the translator must be available for testimony and cross-examination); *United States v. Curbelo*, 726 F.3d 1260, 1271–77 (11th Cir. 2013) (finding no violation of the Confrontation Clause because another party to the wiretap independently confirmed transcript accuracy at trial); *United States v. Romo-Chavez*, 681 F.3d 955, 959-61 (9th Cir. 2012) (no violation where the officer who translated the statements appeared at trial for cross-examination). Here, no one confirmed anything. Not one translator testified. Not one witness with knowledge of the translations was available for cross-examination.

In this case, at least fifteen translators across four companies produced English versions of private Spanish messages—not just Mr. Rovirosa's, but those of every participant—for use in this prosecution. The translators never spoke to the people whose words they were translating. They lost the voice, the culture, the context. They guessed— and they got it wrong. Under *Crawford*, the government was required to produce translators who could answer questions about the choices they made—not because the defense proved errors, but because the translations were testimonial from the moment they were prepared for prosecution. The defense's challenge using a translation company and federal interpreter removed any doubt, even under pre-*Crawford* case law. The government produced no one.

<u>Constitutional Background</u>

This is not a question about language. It is a question about the Constitution. The Sixth Amendment says the accused has the right "to be confronted with the witnesses against him." The rule is straightforward: if a witness's testimonial statement is used against the defendant, that witness must appear for cross-examination—or the statement is inadmissible. Even if the underlying Spanish messages are admissible, that does not solve the government's problem. The English translations are independent testimonial acts—separate statements by separate people. *See United States v. Charles*, 722 F.3d 1319, 1324 (11th Cir. 2013). The government never produced a single one of those people.

This is not a new problem. The Confrontation Clause exists because of a case like this one. In 1603, Sir Walter *Raleigh* stood trial for treason. The Crown's evidence was a written statement from Lord Cobham—a statement *Raleigh* could not challenge because Cobham was never brought to court. *Raleigh* begged the judges: "Call my accuser before my face." They refused. He was convicted and sentenced to death on paper he could not test. One of the judges who condemned him later admitted that "the justice of England has never been so degraded and injured as by the condemnation of Sir Walter *Raleigh*." *See Crawford*, 541 U.S. at 44-45 (recounting this history as the "most notorious" instance of the abuse the Confrontation Clause was designed to prevent).

The Framers knew *Raleigh*'s story. They put the Confrontation Clause in the Bill of Rights so it would never happen again. As Justice Scalia wrote for a unanimous Court in *Crawford*, the "principal evil" the Clause targeted was "the use of ex parte examinations as evidence against the accused"—written statements, prepared outside the

courtroom, that the defendant could never challenge face-to-face. *Id.* at 50. That is what happened here. The government convicted Mr. Rovirosa using written English translations—prepared by people who never appeared in court, never took the stand, and never answered a single question from the defense. *Raleigh* at least knew what Cobham's words said. Here, the jury heard English words chosen by strangers—translators who never met the speakers, never heard their voices, and never understood their world.

### *Crawford* and *Charles*

Under *Crawford v. Washington,* 541 U.S. 36, 51–52 (2004), the rule is simple: if a statement was made for use at trial, the person who made it must testify. It does not matter how reliable the statement looks on paper—the Constitution requires the witness to show up. A translation prepared for a criminal prosecution is exactly such a statement. The Supreme Court applied this principle in *Davis v. Washington*, 547 U.S. 813, 822 (2006): a statement is testimonial when its main purpose is to prove facts in a criminal case. The government's translations were made for exactly that purpose—to prove the charges at trial. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312-313 (2009), the Supreme Court held that certificates of analysis prepared for litigation are testimonial.

In *United States v. Charles*, 722 F.3d 1319, 1324 (11th Cir. 2013), Judge Barkett—herself born in Mexico—outlined how translations were testimonial under *Crawford*. She wrote, "Interpreters do not interpret words, they interpret concepts." As Justice Holmes recognized over a century ago, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245

U.S. 418, 425 (1918). That distinction is the heart of this case. A single word choice by a translator can be the difference between criminal intent and innocent mistake—"wrong" versus "incorrect," "agreed" versus "understood," "directed" versus "asked." When the government chooses the translator and the defense never gets to ask why a particular word was chosen, the Confrontation Clause is violated.

In *Charles*, Judge Barkett held there are two separate sets of testimonial statements by two separate declarants: (1) the foreign language statement, and (2) the English-language translation. The Court rejected the pre-*Crawford* "language conduit" theory (which is what the government is arguing, with the "we have certifications position"), holding it "cannot survive post-*Crawford*" because it relies on reliability rather than confrontation. "Even though an interpreter's statements may be perceived as reliable, *Crawford* rejected reliability as too narrow a test." *Charles,* 722 F.3d at 1327. The Supreme Court reaffirmed this principle in *Hemphill v. New York*, 595 U.S. 140, 152 (2022): "If *Crawford* stands for anything, it is that the history, text, and purpose of the Confrontation Clause bar judges from substituting their own determinations of reliability for the method the Constitution guarantees . . . testing in the crucible of cross-examination."

<u>Other Cases Following *Charles*</u>

In *Taylor v. State*, No. 2686, Sept. Term 2013 (Md. Ct. Spec. App. 2016), the Court of Special Appeals of Maryland independently adopted the *Charles* framework, holding that government-prepared translations of foreign-language text messages were testimonial under *Crawford* and that their admission without the translator violated the

Confrontation Clause. *Taylor* examined the same arguments the government makes here and rejected every one. The Nebraska Supreme Court followed suit in *State v. Lopez-Ramos*, 929 N.W.2d 414 (Neb. 2019), explicitly rejecting the language conduit theory as rooted in the *Ohio v. Roberts* reliability framework that *Crawford* expressly overruled. The doctrinal chain is clear: *Roberts* allowed reliability to substitute for confrontation; *Nazemian* applied that principle to translators; *Crawford* eliminated the foundation on which *Nazemian* rested. In *United States v. Kolodesh*, 415 F. Supp. 3d 613 (E.D. Pa. 2019), a federal district court held that FBI translations of foreign-language chat messages were separate testimonial statements under *Charles*, requiring the translator's appearance for cross-examination. No Fifth Circuit case has addressed this question since *Crawford*. The key point is this: even if the original Spanish messages are admissible, the English translations are a separate question—and that is the issue before the Court.

Pre-*Charles* Language Conduit Theory Required Witness

The "language conduit" theory treats a live interpreter as a mere channel—a mouthpiece for the party. It applies when a party "speaks through" an interpreter in real time, using verbal and nonverbal clues to ensure the correct meaning is conveyed. Under pre-*Crawford* language conduit precedent, evaluating whether the translator was a mere language conduit, the government would have violated the Confrontation Clause under *Nazemian's* four factors because: (1) the government supplied the fifteen translators, from four different companies, all using different approaches, with zero consistency (*see* chart below); (2) the translators were paid and directed by the government; (3) unlike a court translator, the translators' skills and qualifications were unknown and undisclosed

in the certifications; and (4) their translations were riddled with inconsistencies and errors, conducted years after the act, and the translators never spoke to anyone who authored any electronic communication (or had access to anything that would support that translator as a language conduit). *See United States v. Nazemian,* 948 F.2d 522, 527 (9th Cir. 1991). As the Maryland Court of Special Appeals recognized in *Taylor*, this test was built for a different era—before *Crawford* made clear that the Constitution demands cross-examination, not a judge's comfort with the translation's reliability. Indeed, even *Nazemian* itself acknowledged as much: in a footnote addressing non-undercover contexts like this one, the Ninth Circuit stated that "there is no reason why the interview cannot be recorded and/or the translation cannot be conducted by a certified translator who can be available to testify at trial." *Nazemian*, 948 F.2d at 527 n.7. But even under *Nazemian*'s own framework, the government fails every factor.

By its plain terms, the "language conduit" theory does not apply to translations of years-old electronic communications involving multiple parties. The 15+ translators who translated the multiple electronic communications in this case could not, and did not, act as "conduit" for any of the parties, none of whom they had ever seen or spoken with and none of whom were contacted to confirm the meaning of the communications. No court has ever applied the "language conduit" theory to exempt translations of years-old electronic communications involving multiple parties from the Confrontation Clause.

The cases applying this theory almost always involve simultaneous interpretation or transcripts of in-person communications—not written translations of electronic messages. *See, e.g., United States v. Soriano*, 2021 WL 2744644 (9th Cir. 2024)

(interpreters who interviewed the defendant and who read back the statement back to the defendant line-by-line to confirm what she had said were "language conduits"); *United States v. Orm Hieng*, 679 F.3d 1131 (9th Cir. 2012) (the interpreter translated for the defendant at a pre-trial interview, at trial, and at in-person meetings and thus was a "language conduit" for the defendant); and *United States v. Ye*, 808 F.3d 395 (9th Cir. 2015) (translators provided by the government to the defendant through its on-demand telephonic translation service were "language conduits"). The translators are not the speakers. They cannot be treated as "identical" to the people whose words they translated. *See Orm Hieng*, 679 F.3d at 1139 ("A defendant and an interpreter are treated as identical for testimonial purposes if the interpreter acted as a 'mere language conduit' or agent of the defendant.").

Even Circuits retaining the language conduit theory post-*Crawford* require rigorous analysis of translator qualifications. *See, e.g., United States v. Orm Hieng*, 679 F.3d 1131, 1140 (9th Cir. 2012). The Fifth Circuit adopted the language conduit theory pre-*Crawford* in *United States v. Cordero*, 18 F.3d 1248, 1253 (5th Cir. 1994), holding that "[e]xcept in unusual circumstances, an interpreter is no more than a language conduit." But *Cordero* is different in every way that matters: it was decided a decade before *Crawford*, involved a live interpreter at a drug deal, and the defendant did not object. And *Cordero* itself carved out an exception for "unusual circumstances." This case is that exception. Fifteen translators across four companies. A surrogate certifier who did not do the work. Documented errors of five-year-old texts. A jury that asked for the original Spanish because the English was not good enough. Whether the Court applies

the language conduit test or *Charles*, the result is the same: the translations were inadmissible and testimonial without live testimony from the translators.

Fifth Circuit *Budha* Case Not Dispositive

Post-*Crawford*, the Fifth Circuit has not squarely addressed this issue. In *United States v. Budha*, 495 F.App'x 452 (5th Cir. 2012), the Fifth Circuit re-affirmed the language conduit theory (*citing United States v. Hieng*, 679 F.3d 1131 (9th Cir. 2012)), but that case is unpublished and involved a defendant's own oral statement—nothing like written translations of years-old electronic messages involving dozens of people. That same year, the Supreme Court reaffirmed *Crawford* in *Bullcoming*, which conflicts with the "language conduit" theory. The Court rejected the "scrivener" or "conduit" argument, holding that individuals who prepare or translate evidence are not merely recording facts but participating in the creation of testimonial evidence. As the Maryland Court of Special Appeals put it in *Taylor*, the conduit theory asks precisely the type of question that *Crawford* says is not the right question—it substitutes a judge's reliability assessment for the cross-examination the Constitution requires. *Taylor*, No. 2686, Sept. Term 2013, slip op. at 25.

The *Taylor* court dismantled *Nazemian* point by point. *Nazemian* was decided in 1991—thirteen years before *Crawford*. Its four-factor test asks whether a translation is reliable enough to excuse the translator's absence. But *Crawford* eliminated reliability as the test. The question after Crawford is not whether the translation looks good enough. The question is whether the defendant got to cross-examine the person who made it. *Nazemian* answers the wrong question. *See Lopez-Ramos*, 929 N.W.2d at 425 (arguing

that the language conduit theory does not withstand scrutiny under *Crawford*); *Smith v. Arizona,* 602 U.S. 779, 802-03 (2024) (reaffirming *Crawford* and *Bullcoming*). Even if this Court were to reject the *Charles* framework, ignore *Crawford*, and apply the older language conduit theory cases, the result would be the same.

Even when courts have found no Confrontation Clause violation in translated statements, they have done so because another witness confirmed the translations' accuracy. *See, e.g., United States v. Curbelo*, 726 F.3d 1260 (11th Cir. 2013) (finding no Confrontation Clause violation in allowing the translation of wiretaps without the translator being present in court; another party to the wiretap independently confirmed the transcripts' accuracy at trial); *United States v. Richard*, 678 Fed.Appx. 927,940 (11th Cir. 2017) (a third-party's independent, firsthand review of the recordings and transcripts for accuracy, combined with the third party's availability to the defendant for cross-examination, suffices for purposes of the Confrontation Clause); and *United States v. Romo-Chavez*, 681 F.3d 955 (9th Cir. 2012) (Confrontation Clause not implicated where the officer who translated the defendant's statements appeared at trial). Here, no one testified about the translations or their accuracy. Given the documented errors and with or without the "language conduit" theory, the failure to produce any translator at trial was a clear violation of the Confrontation Clause.

### Court's October 21 Order Addressing *Charles*

The defense agrees with the Court that the original Spanish-language messages between co-conspirators are not testimonial—the defense has never argued otherwise. But *Charles* does not hold that the original foreign-language *messages* are testimonial—it

holds that the English-language *translations* are a second, independent set of testimonial statements by different declarants—the translators themselves. 722 F.3d at 1324. Whether Mr. Rovirosa was a party to the original Spanish conversation is irrelevant to the *Charles* question: the over fifteen translators who turned those conversations into English for trial are separate declarants whose statements require independent Confrontation Clause protection. *United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018), cited by the Court, answers a different question: whether the original co-conspirator messages are testimonial. It says nothing about translations. The admissibility of the underlying messages under FRE 801(d)(2)(E) does not resolve whether the English translations independently require confrontation. These are two separate questions. The Court's October 21, 2025 pretrial order addressed only the first.

The Court's October 21 pretrial order also found *Martinez-Gaytan* inapplicable because the translations were by "certified translators." ECF 75 at 7. Post-*Crawford*, Mr. Rovirosa had a constitutional right to cross-examine the translators irrespective of the flawed certifications. Even if the Court ignores *Crawford*, and requires Mr. Rovirosa to show the certifications were unreliable, however, he has met and exceeded that standard as highlighted by $22,789 spent for an independent review involving eight linguists, and information from a federally certified court interpreter with over thirty years of experience. And not one of the certifications met applicable legal requirements as pointed out by the defense pre-trial (*see*, *e.g.*, Oct. 20 Hr'g. Tr. at 69-70) and outlined in great detail below.

The Government's *Bullcoming* Surrogate Problem

Even if the government had called Maria Vega, it would not have solved the problem—it would have created a new one. In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Supreme Court held that a forensic report may not be admitted through the testimony of a different analyst who did not perform the analysis. The reasoning is straightforward: a surrogate cannot be cross-examined about what another person did, observed, or decided. The surrogate has no personal knowledge of the original analyst's methodology, competence, or chain of custody. The same principle applies here. Maria Vega appeared to certify translations mostly performed by others. *See* Exhibit 5 and chart below. In fact, the government concedes this in its letter noticing her as a potential witness. *See* Exhibit 3 (noting Vega "may testify regarding the translations that she and others performed in this case."). Her certification is so thin and legally deficient (addressed below), it is impossible to tell what she did.

She had no personal knowledge of how the other translators handled slang, informal Spanish, or ambiguous phrasing. She could not have explained the interpretive choices made by at least 15 translators, working in multiple states, for different companies—because she did not make them. Calling Vega would have been the translation equivalent of calling a different lab analyst to explain a blood test someone else ran, flatly prohibited by *Bullcoming*. Translation is not chemistry. Every choice is a judgment call—and it is a judgment call with no objective baseline against which to measure accuracy. Cross-examination is meant "to weed out not only the fraudulent analyst, but the incompetent one as well." *Melendez-Diaz*, 557 U.S. at 319. That is why cross-examination exists. Maria Vega never showed up to explain anything.

<u>The Government's Misleading Letter Ignoring Sixth Amendment Issue</u>

In its October 5, 2025 letter to the Court, ignoring *Crawford*, the government cited five cases to argue the defense must create its own translations. Not one of those cases answers the question this Court is asking. Each is distinguishable or actually supports the defense:

- *United States v. Llinas*, 603 F.2d 506, 509–10 (5th Cir. 1979): Pre-*Crawford* decision (1979). Addresses competing translations—not whether a translator must testify. *Llinas* says when parties disagree, each side may present competing versions for the jury. That addresses which translation to credit—not whether the Confrontation Clause requires live testimony. *Llinas* predates *Crawford v. Washington,* 541 U.S. 36 (2004). And the defense couldn't produce "competing translations"—Rovirosa wasn't a speaker in most messages, and translating his own statements would violate the Fifth Amendment.

- *United States v. Onori*, 535 F.2d 938, 948–49 (5th Cir. 1976): Cited by *Llinas* for competing-translations procedure. Pre-*Crawford*. At most, accuracy is a jury question—the defense's point: the jury cannot judge accuracy without hearing from the translator.

- *United States v. Armendariz-Mata*, 949 F.2d 151, 156 (5th Cir. 1991): Pre-*Crawford*. Says a court has "no obligation to rule on accuracy" absent a challenge. But in our case the defense did challenge—$22,789 in independent review, eight linguists, a federally certified court interpreter, and specific documented errors. Inapposite.

- *United States v. Stone,* 960 F.2d 426, 436–37 (5th Cir. 1992): *Stone*: English-language audio transcripts. In *Stone*, the jury heard originals and transcripts were only "aids." Here, the jury never got the original Spanish—the translations were the evidence. *Stone* supports the defense. Pre-*Crawford*.

- *United States v. Ayelotan*, 917 F.3d 394, 401–403 (5th Cir. 2019): *Ayelotan* involved English-language emails—no translation at issue. Three-week trial with live witnesses who could be cross-examined. Here, no translator testified. Yet AUSA Brad Gray repeatedly cited *Ayelotan* as authorizing its no-live-witness strategy—telling the Court the case was "completely analogous" and that it "talked to this precise issue." (Trial Tr. Day 2 at 445–46). The Court, relying on that representation, ruled: "I'm back to where I was. I'm going to permit you to move forward." (*Id*. at 446). It was neither analogous nor on point. The Fifth

Circuit never addressed whether government-prepared translations of foreign-language messages are testimonial. The defense does not dispute the original Spanish messages are non-testimonial—the issue is that the English translations are separate statements by different declarants, prepared for prosecution, making them testimonial under *Charles*, 722 F.3d at 1324.

Four of five (*Llinas*, *Onori*, *Armendariz-Mata*, and *Stone*) predate *Crawford* and address competing-translation procedure—not whether translators must testify. The fifth (*Ayelotan*) involved English-language emails with live witnesses. None addresses *Charles*, *Bullcoming*, or *Melendez-Diaz*.

The government ignored the Sixth Amendment because to acknowledge it would mean calling witnesses—and its translators could not withstand cross-examination. Their own notations of incomplete translations and the defense experts' findings of systematic errors prove it. The defense objected to every translation, was overruled, and was told to present its own. But as the defense explained: "we can't create any better transcripts than they can create because we don't have any witnesses either." (Oct. 6 Hr'g Tr. at 25). At least fifteen different translators, working independent of one another in separate locations in different times, made hundreds of disconnected choices—producing a patchwork narrative no single person could explain or defend. The defense's review by Hoover and TransPerfect confirmed systematic problems throughout. *See* Exhibit 1.

The record proves the challenge was well-founded. A jury cannot fairly evaluate the government's evidence when the English words it reads were chosen by 15+ different people, none of whom the defense could question about those choices. And where translations are incomplete or incorrect—as the defense's experts proved these were—they are "the functional equivalent of no translation" at all. *Illunga v. Holder*, 777 F.3d

199, 208 (4th Cir. 2015) (*citing Perez-Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000)). If a defective translation is no translation, then the government tried this case with no evidence the jury could trust.

> **2. When, if ever, do government translations of written foreign communications become admissible and under what federal rules of evidence? The Court seeks case precedent over arguments.**

Under *Crawford*, when a translation's primary purpose is prosecution, it is a testimonial statement—and the translator must be available for cross-examination whether or not the defense challenges accuracy. Without that opportunity, the translation is inadmissible. These translations were never admissible without a live witness who performed the work—unless the defendant agreed (which the government falsely claimed to this Court during the jury note episode).

Even if the Court viewed the translators as language conduits, the Fifth Circuit has always required translator testimony when accuracy is challenged. In *United States v. Martinez-Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000), the government used an interpreter to translate a defendant's recorded statement, and the defense challenged the translation's accuracy. The Fifth Circuit vacated the conviction, holding that "absent in-court testimony" by the translator "that will help the court assess his reliability as a translator and give [the defendant] an opportunity to attack the quality of the translation, the district court's decision to deny [the] motion to suppress in this case was clearly erroneous." *Id.* at 892. The facts here are far worse: fifteen translators, four companies, thousands of messages, and not one translator called to testify. *See also United States v. Sutherland*, 656 F.2d 1181, 1201 (5th Cir. 1981) ("when the transcript contains a translation into

English of conversation spoken in a foreign language, the proponent must introduce the testimony of a qualified witness to authenticate and verify the translation"). The government did not do this.

Under either framework—*Crawford* or pre-*Crawford*—the answer is the same: these translations were inadmissible without a live witness. And even setting the Confrontation Clause aside entirely, the government's certifications did not meet basic evidentiary requirements, as outlined below.

### 3. Who translated the WhatsApp and email transmissions from the defendant's device? Are there certifications to support translations? What rules support admission?

At least fifteen translators across four companies—JTG, GLS, ManpowerGroup Public Sector, and LingPerfect—performed the translations, as shown below. There are certifications. None meets FRE 604, FRE 702, or 28 U.S.C. § 1746. But that is not the point. Under *Crawford*, these translations were prepared for prosecution—that makes them testimonial, and the translators were required to appear for cross-examination whether the certifications were perfect or not. The defense proved the translations were inaccurate, making the need for live testimony undeniable, under even those most liberal Confrontation Clause standards. The government called none of them.

Even setting aside the Confrontation Clause, a translation may become admissible with a certification only when: (1) the translator is qualified (FRE 604/702); (2) the translation is authenticated (FRE 901); and (3) the translation is certified for accuracy (28 U.S.C. § 1746). The certification must show the translator's qualifications—otherwise no one can confirm the translator was competent to do the work.

The Fifth Circuit has not addressed what a certification must contain. But district courts in the Ninth Circuit have (the circuit whose language conduit theory the Fifth Circuit adopted pre-*Crawford*/*Bullcoming*). In *Jack v. Trans World Airlines, Inc.*, 854 F. Supp. 654, 659 (N.D. Cal. 1994), the court held that translations must be authenticated by sworn testimony describing the translator's qualifications; unsworn, unqualified translations are inadmissible. Courts treat translators as expert witnesses under the same qualification framework. In Texas, the Rules of Evidence (which largely track the FRE) require that a certification (1) sets forth the translator's qualifications; (2) certifies that the translation is "fair and accurate;" and (3) is served on all parties at least 45 days before trial along with the underlying foreign-language documents. TEX. R. EVID. 1009. The Fifth Circuit specially requires courts to examine the "qualifications and language skills of an interpreter. *See Cordero*, 18 F.3d at 1252–53.

The chart below, drawn from Exhibit 5, identifies at least fifteen translators and their companies:

| # | Gov Translator | Company | Date | Avila's Phone | Rovirosa's Phone | Other Docs | Surrogate |
|---|---|---|---|---|---|---|---|
| 1 | Maria Elena Vega | JTG | 06/26/25; 07/18/25; 07/28/25; 10/7/25; 10/8/25 | No | Yes | No | **<u>Yes</u>** |
| 2 | Carla Parodi | JTG | 06/30/25; 07/2/25; 07/18/25; 09/19/25; 09/21/25; 09/23/25; 09/30/25; 10/19/25 | Yes | Unknown | Yes | No |
| 3 | John M. Milan | JTG | 06/30/25; 07/28/25; 09/30/25; 10/02/25; 10/17/25; 10/30/25 | Yes | No | Yes | No |
| 4 | Heather Oland | JTG | 07/1/25; 07/28/25 | No | Yes | No | No |
| 5 | María del Pilar Rodríguez | JTG | 6/27/25 (2 certs); 07/28/25; 09/22/25 | Yes | Yes | Yes | No |
| 6 | Rosemery Cardenas | JTG | 06/20/25; 07/20/25; 09/22/25; 9/30/25 | Yes | Yes | Yes | No |
| 7 | Samuel Phillips | GLS | 08/05/25; 08/25/25 | Yes | Yes | No | No |
| 8 | Rosalie P. Wells | GLS | 07/01/25 (2 certs) | Yes | No | Yes | No |

| 9 | Angie del Cuadro | MGPS | 06/23/25 | Yes | No | No | No |
|---|---|---|---|---|---|---|---|
| 10 | Francis Rios | MGPS | 07/25/25 | Yes | No | No | No |
| 11 | Maria Parodi | MGPS | 09/20/25 | No | Yes | No | No |
| 12 | Robert Lazaneo | MGPS | 09/25/25; 09/24/25 | No | No | Yes | No |
| 13 | Elena Delpin-Lund | MGPS | 09/25/25 | No | No | Yes | No |
| 14 | Jessica Delgado/ Manuel Prado | MGPS | 09/22/25 | No | Yes | No | No |
| 15 | Aracely Yates | MGPS | 09/24/25 | No | No | Yes | No |

*No certification included translator qualifications, methodology, or reliability showing under FRE 702. None testified.* There may be more translation certifications, these are the documents the defense could locate in the discovery; and there is no rhyme or reason tying them to the production, so this chart is the defense's best guess on what documents were covered by the certifications. Only cross-examination would have revealed the connection between the bates-marked discovery (beginning with DOJROVIROSA) and these certifications—with only two of the original certifications (not counting Vega's surrogate certification) referring to the actual discovery markings.

The government's certifications are boilerplate. Each says the same two things: the translator was "competent" and the translation was "true and accurate, to the best of the person's abilities"—whatever those abilities were. *See* Exhibit 5. That is all. No translator qualifications. No methodology. Worse, for virtually all of the certifications it is impossible to tell what document the certification relates to. For instance, in a September 23, 2025 certification by Carla Parodi, the document is noted only as "avila." An August 29, 2025, certification by Samuel Phillips refers vaguely to a document called "Avila Lizarraga." Virtually none of the deficient certifications referenced the actual government production, which began with DOJ Rovirosa (*see* below), making it impossible to match the certifications to the actual production.



## CONCLUSION

This Court asked the right questions. The answers all point one way. Over fifteen government-paid translators turned five-year-old private Spanish messages into English for trial. Under *Crawford*, that makes them testimonial—and the translators were required to appear for cross-examination. They never spoke to a single participant, never understood the culture or context, and never got the words right. The government knew certifications were not enough—it prepared Maria Vega as a witness—then never called her. No translator testified.

The defense preserved this objection at every stage and was overruled each time. In closing, the government told the jury: "Forget the narrator." (Day 4 Trial Tr. at 947). But the jury could not forget. It sent a note asking for the original Spanish. Twelve citizens knew something was wrong with the English and tried to look past it. They could not. This error was not harmless. The translations were not supporting evidence for a case built on other proof. They *were* the case. Without them, the government had no witnesses with personal knowledge, no cooperators, and no documents linking Rovirosa to the charges. The government bears the burden of proving the error harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). It cannot meet that burden. The government built its entire case on English words that no one in these conversations ever wrote—chosen by translators who never met any of them, certified by someone who did not do the work, and presented to a jury that knew something was wrong. Remove the translations, and there is nothing left. The appropriate remedy is acquittal.

R. MCCONNELL GROUP

By: */s/ Ryan D. McConnell*
Ryan D. McConnell
Texas Bar No. 24051020
Matthew S. Boyden
Texas Bar No. 24113620
Lawrence D. Finder
Texas Bar No. 07007200
5850 San Felipe, Suite 500
Houston, Texas 77057
Telephone: 713.224.5775
ryan@rmcconnellgroup.com

BREAZEALE, SACHSE & WILSON

*/s/ Catherine M. Maraist*
Pro Hac Vice
Louisiana Bar No. 25781
300 Main Street, Ste. 2300
Baton Rouge, LA 70801
Telephone: 225.381.3168
catherine.maraist@bswllp.com

## CERTIFICATE OF SERVICE

On February 24, 2026, the foregoing was served on all counsel of record via the ECF filing system.

*/s/ Ryan D. McConnell*
Ryan D. McConnell